558 F.2d 456
 Karen DULIN, Administratrix of the Estate of John W. Dulin,
Deceased, Weyerhaeuser Company, Don McCormick Painting
Company, Hubbell Lighting Division, Harvey Hubbell, Inc.,
Pass and Seymour, Inc., and William C. Haynes, Appellees,
v.
CIRCLE F INDUSTRIES, INC., Appellant.
 No. 76-1393.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 12, 1977.
Decided July 5, 1977.
Rehearing Denied Aug. 3, 1977.
 
 E. Lawrence Merriman, Texarkana, Tex. (argued), and David E. Hightower, Texarkana, Tex., on appendix and briefs, for appellant.
 John B. Greer, III, Texarkana, Tex. (argued), and William A. Carter, Carrollton, Ky., for appellee Karen Dulin.
 George L. McWilliams, Texarkana, Tex., argued and on brief for appellee, Don McCormick Painting Co.,
 Before MATTHES, Senior Circuit Judge, and BRIGHT and HENLEY, Circuit Judges.
 HENLEY, Circuit Judge.
 
 
 1
 This multi-party products liability case with respect to which the district court had diversity jurisdiction arises out of the accidental death by electrocution of John W. Dulin, which occurred on September 26, 1973. At the time of his death Dulin and a fellow employee, William C. Haynes, were in the employ of Don McCormick Painting Company of Little Rock, Arkansas, and were engaged in work preparatory to the sandblasting and painting of the interior of an elevated steel water tank located at the Briar Plant of Weyerhaeuser Company in Nashville, Arkansas.
 
 
 2
 The accident resulted from the malfunction of an electrical assembly that Haynes, the "lead man" on the job, had put together for the purpose of providing illumination for the sandblasting and painting work that was to be done inside the tank. The malfunction was caused by the fact that Haynes, who was not an electrician, had miswired a male plug or connector that he had affixed to one of the two extension cords that were component parts of the assembly that the men planned to use. The miswiring of the male plug caused a metal clamp on a female connector at the other end of the assembly to become electrically energized as it was being held by Dulin, and the current entered Dulin's body causing his death.
 
 
 3
 The female connector just mentioned had been manufactured and sold by appellant, Circle F Industries, Inc., and the male plug that was miswired had been manufactured and sold by Pass and Seymour, Inc. The female plug was located at what we will call the distal end of the assembly, and the male plug was located at the proximal end.
 
 
 4
 At the time of his death Dulin was covered by the Arkansas Workers' Compensation Act, Ark.Stat.Ann. §§ 81-1301 et seq., and his surviving widow and minor child were paid benefits under the Act.
 
 
 5
 Dulin's widow was appointed administratrix of his estate, and in 1974 she commenced this action in the United States District Court for the Western District of Arkansas as authorized by Ark.Stat.Ann. § 81-1340. The original complaint named no defendant other than Circle F, and claimed that Circle F was liable for the death of Dulin on account of alleged negligence and breach of warranties and on the theory of strict liability in tort.
 
 
 6
 Circle F denied liability. Numerous pleadings, amended pleadings and cross-pleadings were filed, and new parties were brought into the case. Weyerhaeuser became both a principal defendant and a third party defendant. Don McCormick Painting Company and Haynes were named as third party defendants. Another third party defendant was Harvey Hubbell, Inc., the manufacturer of a spotlight that Dulin was undertaking to use when he was killed.
 
 
 7
 When the case came to trial, plaintiff was asserting claims against Circle F, Pass and Seymour, Inc. and Weyerhaeuser. Circle F and Pass and Seymour were asserting third party claims against Weyerhaeuser, McCormick, Hubbell and Haynes.
 
 
 8
 The case was tried to a jury on March 15-18, 1976, with Chief United States District Judge Paul X Williams presiding. At the conclusion of the evidence Judge Williams directed verdicts in favor of Weyerhaeuser, McCormick and Hubbell; he denied motions for directed verdicts filed by Circle F, Pass and Seymour and Haynes.
 
 
 9
 As to the defendants and third party defendants just mentioned, the case was submitted to the jury on plaintiff's negligence theory only, and the jury was told that it could not find against Haynes unless it found against at least one of the principal defendants. The district court declined to instruct the jury on alleged assumption of risk by Dulin and also refused requests by the defendants to instruct the jury with respect to the alleged contributory negligence of Dulin.
 
 
 10
 The jury returned a verdict against both Circle F and Pass and Seymour but found that they were not entitled to contribution from Haynes. The awards amounted to $125,000.00, and the jury apportioned them between the widow and the minor child.
 
 
 11
 On March 24, 1976 the district court entered judgment in accordance with the verdict. On April 5 a motion for judgment notwithstanding the verdict filed by Circle F was denied, and Circle F filed a notice of appeal on April 15. Circle F is the only appealing party.[1]
 
 
 12
 For reversal, Circle F contends that the district court erred in denying its motion for judgment notwithstanding the verdict and also erred in directing verdicts in favor of Weyerhaeuser and McCormick. Circle F contends further that the district court erred when it refused Circle F's request for an instruction on the alleged contributory negligence of Dulin. Circle F does not complain about the dismissal of its claims against Hubbell and Haynes.
 
 
 13
 There is little dispute about the historical facts of the case, but they need to be stated in some detail.
 
 
 14
 Don McCormick Painting Company is an Arkansas corporation, all of the stock in which is owned by Don McCormick. McCormick is a painting contractor and engages in industrial painting and related work including the sandblasting and repainting of metal structures such as water tanks.
 
 
 15
 Sandblasting equipment used by employees of McCormick is powered by compressed air. In industrial painting much use is made of electrical power, including its use for the purpose of illuminating interior work sites such as the inside of a tank. The use of electrical equipment on a job often involves the use of an extension cord or a combination of two or more cords connected together and with the whole assembly being connected to a power source.
 
 
 16
 An extension cord normally has a "female" connector at one end and a "male" connector at the other end. When a cord is bought new, it comes equipped with plugs or connectors at each end. However, if a cord is used over a period of time, it may become necessary to replace one or both of the plugs or connectors.
 
 
 17
 Equipment used by McCormick employees is furnished by McCormick, and McCormick maintains a shop in Little Rock where equipment is stored and repaired. The work done in the shop includes replacing defective or worn out plugs[2] with new ones. Some extension cords used in industrial work contain three insulated wires, a live or "hot" wire, a ground wire and a neutral wire. Plugs for such wires have three terminals, each of which is supposed to be connected with a corresponding wire in the cord. Thus, when connecting a plug to a cord one wires hot to hot, ground to ground, neutral to neutral. A male plug for a three wire cord has three prongs protruding from it which may be fitted into openings in a female plug.
 
 
 18
 Probably most if not all three wire cords in use in recent years have their wires "color coded." The insulation of the hot wire is generally black; the insulation on the ground wire is generally green, and the insulation on the neutral wire is generally white or some neutral color. The terminals in three prong plugs are also color coded in a manner that at least roughly corresponds to the colors of the insulation on the wires that make up the cord. Additionally, the shape of a terminal in a plug may indicate to an electrician whether the terminal is a hot terminal, a ground terminal or a neutral terminal.
 
 
 19
 In connecting a plug to a cord it is highly important from the standpoint of safety that the ground wire in the cord be connected to the ground terminal in the plug. If the ground wire is connected to the hot terminal, the connection may be a source of danger to a user. However, if the ground wire is connected to the ground terminal, other miswirings will not likely constitute a hazard, although they may prevent the circuit from operating.
 
 
 20
 As we have said before, the work of replacing plugs is generally done in the McCormick shop in Little Rock, and McCormick has testing devices to determine whether a plug has been connected properly. Painters employed by McCormick are not usually electricians, and they are discouraged from undertaking to make repairs on electrical equipment. However, they are not positively forbidden to undertake minor repairs if they feel competent to do so. During the time with which we are concerned McCormick painters had no particular directives as to what to do should they encounter electrical difficulties while on a job a substantial distance from Little Rock.
 
 
 21
 Both Haynes and Dulin were painters and neither had had any electrical training. In late September, 1973 Haynes had been working for McCormick for about two years and Dulin had been employed for about two months; Don McCormick testified that he considered both men to be good workers. The two had not met more than a few days before the accident with which we are concerned.
 
 
 22
 Shortly prior to September 25, 1973 McCormick and Weyerhaeuser entered into a contract under the terms of which McCormick undertook to supply all labor, equipment and materials necessary to sandblast and repaint at least the interior of the Weyerhaeuser tank at Nashville which is about one hundred miles from Little Rock. Haynes and Dulin were assigned to do the work, and, as stated, Haynes was the "lead man" on the job.
 
 
 23
 It was contemplated that the men would proceed to Nashville in a two ton truck supplied by McCormick and loaded with the equipment considered necessary for the performance of the work. Some equipment was loaded into the truck on the evening of September 24 under the supervision of Rubin McCormick who did not testify at the trial. Other items of equipment were already in the truck having been left there after the completion of other jobs.
 
 
 24
 There were certain items of equipment that need to be mentioned at this point. There were two extension cords, both of the three wire variety and both equipped with plugs at both ends. One of those cords was black, and the other was orange. At one end of the black cord was a female connector that had been manufactured and sold originally by Circle F; the record does not reflect from whom or when McCormick obtained that cord or the Circle F plug. It is undisputed that the Circle F connector was properly wired to the cord and that the male plug on the other end of the wire was also properly wired.
 
 
 25
 The men were also furnished with what was commonly called in the evidence a "four way box." That was a small box with electrical outlets for the reception of the prongs of male plugs. A short cord containing wires ran from the box, and there was a male plug on the end of that cord to be used to make a connection with an outside power source. When in use, the box served as an intermediate conduit between the power source and such extension cords as may have been plugged into the box.
 
 
 26
 The men were also furnished with a sandblasting machine equipped with a hose and metal nozzle, a lamp designed to provide general illumination for the men while working in a dark place, and a spotlight designed to provide close illumination for a person operating the sandblasting hose. This spotlight, which had been manufactured by Hubbell, was customarily hung on the nozzle of the sandblasting hose, and while Mr. McCormick did not approve that practice, he had not specifically forbidden it.
 
 
 27
 The only other item that needs to be mentioned was an aluminum "pick board" designed to be hung from the metal "painters' rail" that usually runs around the inside of a water tank and which is welded to the body of the tank. This "pick board" serves as a kind of movable scaffold on which a painter stands or sits while at work.
 
 
 28
 To return to the cords for a moment, both of them had color coded wiring. The orange cord still had its factory plugs on it. The Circle F connector had a metal back and a metal clamp designed to secure the connector to the cord. It appears from the record that where such a clamp is used, it is electrically bonded to the ground wire in the cord. Such bonding is an approved safety device but it serves as such only if there has been proper wiring down the line. If the ground wire in the cord is connected, either directly or indirectly, with a hot wire, electricity will pass up the ground wire and will energize the clamp, and if the clamp becomes so energized and is touched by a person who is "grounded," he will receive a shock which may be severe or even, as in the case of Dulin, fatal.
 
 
 29
 Haynes and Dulin left Little Rock on September 25 and arrived at the work site in due course. They unloaded their equipment, and Haynes arranged with Thomas Lindville, an electrician in the employ of Weyerhaeuser, to provide the McCormick crew with electrical power by running an extension cord from a block house containing a Weyerhaeuser power source to the four way box that has been described. The current to be supplied was 110 volts.[3]
 
 
 30
 In the process of bringing power to the four way box it was found that the plug on the wires running from the box had become overheated in some manner and was unusable. That problem was solved when Weyerhaeuser personnel cut the defective plug from the wires and spliced them to Weyerhaeuser's own wires. There is no question that this was done properly, and that there was no negligence on the part of Weyerhaeuser's people in making the necessary splices.
 
 
 31
 At about this time Haynes and Dulin discovered that the male plug on the orange cord was in bad order and had to be replaced. Haynes requested Lindville to provide him with a male plug, and Lindville complied with that request furnishing Haynes out of Weyerhaeuser's supplies a yellow, male plug manufactured by Pass and Seymour. No written instructions came with the plug;[4] Haynes did not ask for any instructions about how to connect the plug, and neither Lindville nor any other Weyerhaeuser employee undertook to give him any instructions or warnings.
 
 
 32
 Haynes did not attempt to connect the Pass and Seymour plug on the 25th. The rest of that day was spent in cleaning up the interior bottom of the tank and moving equipment into the tank. The equipment brought into the tank included the sandblasting machine with its hose and nozzle, the explosion proof lamp, and the pick board which was apparently hung on the painters' rail by means of a metal hook or metal hooks.
 
 
 33
 With those preliminary tasks performed, the men ceased work for the day and spent the night in a motel, returning to the work site on the morning of September 26.
 
 
 34
 When the men got back to work, Dulin engaged himself in tasks around the tank, and Haynes undertook the construction of the electrical assembly designed to get light into the tank. This involved affixing the Pass and Seymour plug to the proximal end of the orange cord, and the connection of the orange cord to the black cord. Haynes performed both of those tasks, and in so doing he miswired the Pass and Seymour plug by connecting the ground wire in the orange cord to the hot terminal in the plug.
 
 
 35
 Haynes testified at the trial that while he had on a few occasions connected plugs to two wire cords, he had never tried to connect a plug to a three wire cord, that he knew nothing about color coding, and was simply unaware that a miswiring such as has been described could create a dangerous situation.
 
 
 36
 It appears from the uncontradicted testimony of Haynes that while he was wiring the plug and connecting the two cords Dulin was some distance away working around the tank. There is no evidence that Dulin had any knowledge that Haynes had had no experience in connecting plugs to three wire cords, or that any miswiring had taken place.
 
 
 37
 Having affixed the plug to the orange cord and having joined the two cords together, Haynes proceeded to use a piece of baling wire to tie the distal end of the black cord where the Circle F connector was located and the spotlight to a rope. The wire was in contact with the clamp on the connector and was also in contact with the metal spotlight.
 
 
 38
 Dulin at this point proceeded to haul the apparatus into the tank by means of the rope, and it appears that he hung the spotlight on the nozzle of the sandblasting hose. He then called on Haynes to activate the assembly by plugging the orange cord into the four way box.
 
 
 39
 Haynes did so, and when he did the clamp on the Circle F plug became energized, the current passed along the baling wire and perhaps along the lamp and nozzle and eventually into the body of Dulin who was fatally injured.
 
 
 40
 When Haynes did not hear the sandblasting machine begin to operate, he called to Dulin, and when he received no answer he entered the tank where he found Dulin astride the aluminum pick board with the nozzle and attached spotlight in his hands.
 
 
 41
 Haynes rushed out of the tank and to the four way box and unplugged the orange cord. Weyerhaeuser personnel came to the scene and undertook without success to resuscitate Dulin, who was dead.
 
 
 42
 We have given careful consideration to the contentions of Circle F in the light of the evidence and applicable legal principles. We conclude that the judgment of the district court with respect to McCormick and Weyerhaeuser should be affirmed. We also conclude that the district court did not err in sending the case against Circle F to the jury and did not err in denying Circle F's motion for judgment notwithstanding the verdict. However, we are persuaded that under the pleadings and evidence in the case Circle F was entitled to a proper instruction on contributory negligence on the part of Dulin, that no such instruction was given, and that the case must be remanded for a new trial of the issues between plaintiff and Circle F.
 
 
 43
 We will discuss the issues in the following order:
 
 
 44
 1. The propriety of the dismissal of the third party complaint against McCormick.
 
 
 45
 2. The propriety of the dismissal of Circle F's claim against Weyerhaeuser.
 
 
 46
 3. Whether the plaintiff made a submissible case against Circle F.
 
 
 47
 4. Whether the failure of the district court to instruct on contributory negligence was error.
 
 
 48
 1. The Claim Against McCormick.
 
 
 49
 In its third party complaint against McCormick Circle F alleged that McCormick had been guilty of negligence in a number of respects that was a proximate cause of Dulin's death, and Circle F prayed for contribution[5] or indemnity from McCormick should Circle F be held liable to plaintiff.
 
 
 50
 As has been seen, the district court granted a directed verdict in favor of McCormick and a dismissal of the third party complaint as to McCormick was included in the final judgment of the district court.
 
 
 51
 The actions of the district court with respect to McCormick were not based on any lack of substantial evidence of negligence on the part of McCormick but on the legal proposition that in view of the exclusive remedy provisions of Ark.Stat.Ann. § 81-1304 Circle F had no legal cause of action against McCormick for either contribution or indemnity.
 
 
 52
 Circle F no longer contends that it is entitled to contribution as between tortfeasors, but it does contend that it is entitled to indemnity, and that its right to that relief is not affected by § 81-1304. We disagree.
 
 
 53
 Ark.Stat.Ann. § 81-1340 permits a suit of this kind to be brought against a third party tortfeasor, but § 81-1304 provides that as far as an employer of an injured or killed employee is concerned, the remedies provided by the workers' compensation statute are exclusive.
 
 
 54
 The Supreme Court of Arkansas has recognized that contribution and indemnity are governed by different principles of law. Jack Morgan Const. Co. v. Larkan, 254 Ark. 838, 496 S.W.2d 431, 433 (1973). And that court has also recognized that in a proper case a third party held liable for the death of or injury to an employee covered by the Compensation Act may obtain indemnity in spite of the provisions of § 81-1304. Oaklawn Jockey Club v. Pickens-Bond Const. Co., 251 Ark. 1100, 477 S.W.2d 477 (1972). The right of indemnity may arise from an express contract of indemnity or from a special relationship between the third party and the employer which would give rise to the right. In addition to the cases cited above, see C & L Rural Electric Cooperative Corp. v. Kincaid, 221 Ark. 450, 256 S.W.2d 337 (1953).
 
 
 55
 It is clear from those cases, however, that in the absence of a contract for indemnity running in favor of the third party, a negligent third party tortfeasor is not entitled to either indemnity or contribution from a negligent employer where their concurrent negligence has produced the injury or death of the employee.
 
 
 56
 It is true that even in the absence of an express contract for indemnity Arkansas will allow a third party to have indemnity from a negligent employer where the liability that has been imposed upon the third party is purely vicarious and without fault on his part. That was the situation that existed in Oaklawn Jockey Club v. Pickens-Bond Const. Co., supra, but it is not the situation that exists here. Assuming that McCormick was guilty of causal negligence, the jury has found that Circle F was negligent; thus, those two parties were simply joint tortfeasors.
 
 
 57
 We do not accept Circle F's argument that a user of an article supplied by another owes to the latter any duty of care in connection with the use of the article so as to impose upon the former any duty to indemnify the supplier with respect to liability imposed upon him for damages resulting from a misuse of the product, at least where the supplier himself has been guilty of negligence. In the field of products liability the chain of indemnity ordinarily runs down the chain of distribution and not in the reverse direction. See McClish v. Niagara Machine & Tool Works, 266 F.Supp. 987, 991 (S.D.Ind.1967).
 
 
 58
 The instant controversy between Circle F and McCormick does not differ in substance from the controversy between manufacturer and employer that was involved in Rhoads v. Service Machine Co., 329 F.Supp. 367 (E.D.Ark.1971). In that case, which the writer tried while on the district bench, the jury found a manufacturer guilty of negligence in supplying a dangerous machine to an employer; the jury might also have found and probably would have found that the employer was negligent in permitting the injured employee to use the machine. The manufacturer sought contribution or indemnity, and it was held that it was entitled to neither. See 329 F.Supp. at 371-72.
 
 
 59
 2. The Claim Against Weyerhaeuser.
 
 
 60
 By way of introduction to a discussion of the propriety of the action of the district court in instructing a verdict and entering judgment in favor of Weyerhaeuser we will state some general review standards which are applicable not only to the claim of Circle F that the district court erred with respect to Weyerhaeuser but also to the claim that the district court erred in denying Circle F's own motion for judgment notwithstanding the verdict.
 
 
 61
 Both claims involved questions of the sufficiency of the evidence to take an issue to a jury, and in evaluating those claims it makes no difference whether we apply federal law or whether we apply the law of Arkansas because the federal and state standards are substantially the same. Marshall v. Humble Oil & Refining Co., 459 F.2d 355, 358-59 (8th Cir. 1972).
 
 
 62
 The same standard is applied whether the question of evidential sufficiency arises before verdict in connection with a motion for a directed verdict or whether it arises after verdict in connection with a motion for judgment notwithstanding the verdict, and this court on appeal is required to apply the same standards that the district court was required to apply initially. See 9 Wright & Miller, Federal Practice & Procedure, Civil, § 2524, and cases cited including Schneider v. Chrysler Motors Corp., 401 F.2d 549, 554-55 (8th Cir. 1968).
 
 
 63
 In the recent case of Davis v. Burlington Northern, Inc., 541 F.2d 182, 186 (8th Cir.), cert. denied, 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 613 (1976), this court said:
 
 
 64
 . . . The actual question presented is whether the district court properly denied the defendant's motion for a judgment notwithstanding the verdict, pursuant to Rule 50(b), Fed.R.Civ.P. This motion cannot be granted, of course, unless as a matter of law the opposing party failed to make a case and a verdict in the movant's favor should have been directed. (Citations omitted.) We must now view the evidence in the light most favorable to sustaining the jury's findings and must give the prevailing party the benefit of every reasonable inference which may be drawn from the evidence. (Citations omitted.) Judgment notwithstanding the verdict must be granted if the evidence, so viewed, was such that reasonable men could not differ as to the conclusion that the plaintiff's proof had failed to meet its burden as to an essential element of the cause of action. (Citations omitted.)
 
 
 65
 See also Linn v. Garcia, 531 F.2d 855, 859 (8th Cir. 1976).
 
 
 66
 In view of the principles just mentioned, in passing upon whether or not Circle F made a submissible third party case against Weyerhaeuser, we are required to view the evidence in the light most favorable to Circle F, but even so we are satisfied that the district court did not err in taking the claim against Weyerhaeuser from the jury.
 
 
 67
 As stated earlier, there was no evidence that the Weyerhaeuser personnel were guilty of any negligence in connecting the four way box to the Weyerhaeuser power source. Hence, Circle F's claim against Weyerhaeuser must be predicated upon the proposition that the supplying of the male plug to Haynes carried with it the duty of instructing him as to how to wire the plug and of warning him of the danger to be anticipated if the plug was not properly wired, or in failing to test the wiring done by Haynes, or in failing to install safety devices which would have prevented the miswiring, if any, from having any dangerous or disastrous effect.
 
 
 68
 It is clear that under the contract between Weyerhaeuser and McCormick the former was not required to supply the employees of the latter with any plugs or other items of equipment. The furnishing of the plug to Haynes was an act of pure accommodation from which Weyerhaeuser derived no substantial benefit. Cf. Kennedy v. U. S. Const. Co., 545 F.2d 81, 84 (8th Cir. 1976).
 
 
 69
 We will assume that when Lindville caused Haynes to be supplied with the plug, Lindville was acting within the scope of his authority, and we will assume that he knew or should have known that Haynes would undertake to connect the plug to one of the extension cords at the job site. And we recognize that if a person voluntarily gives or lends to another a tool or other useful object, he may in some circumstances be under a duty to instruct the latter as to how to use the article and as to the dangers to be apprehended from its improper use. We do not think, however, that warning or instructions are required if they are not requested and if there is no reason to believe that the person to whom the article is furnished does not know how to make proper use of it.
 
 
 70
 There is nothing inherently dangerous in the type of plug that was furnished to Haynes, and although a person undertaking to connect such a plug to an extension cord needs to know what he is about, the proper wiring of the plug is not a complicated process and is not one that requires any high degree of skill.
 
 
 71
 In our estimation, when a person asks that he be supplied with a plug and does not ask to be told how to wire it or what he should avoid in wiring it, his conduct amounts to a representation that he is competent to wire the plug, and that in the absence of knowledge or notice to the contrary, the person supplying the plug has a right to rely on the implied representation and to assume that the person to whom the plug is supplied will use due care for his own safety and for that of others. Cf. Norris v. Daves, 251 Ark. 101, 470 S.W.2d 937 (1971).
 
 
 72
 Although Lindville had no reason to believe that Haynes was a skilled electrician, he had no reason to believe that Haynes was not competent to connect the plug, and Haynes did not indicate that he lacked either competency or confidence, and he did not ask for assistance, instructions or warnings.
 
 
 73
 In such circumstances we are unwilling to say that Lindville or other Weyerhaeuser personnel were required to volunteer information or warnings that had not been requested or to check Haynes' work or to install safety devices as suggested by counsel for Circle F.
 
 
 74
 3. Circle F's Claim that No Submissible Case Was Made Against It.
 
 
 75
 The question of whether the district court erred in sending plaintiff's case against Circle F to the jury and in denying Circle F's motion for judgment notwithstanding the verdict is, of course, the most basic question in the case and but for convenience we would have discussed it first. Unlike the question considered in the preceding section of the opinion, the question now before us requires us to view the case in the light most favorable to the plaintiff and to give to her the benefit of all reasonable inferences favorable to her that are to be drawn from the evidence.
 
 
 76
 In her pleadings the plaintiff charged that Circle F was guilty of negligence in the design of the plug and in the choice of material that went into it, and in failing to warn of the dangers involved in using the connector in connection with a circuit that might foreseeably be miswired.
 
 
 77
 In our opinion there was no substantial evidence that Circle F was guilty of any negligent failure to warn or that any failure on the part of Circle F to warn, whether negligent or not, was a proximate cause of Dulin's death. We confine ourselves, therefore, to the plaintiff's claim of negligence in design and material selection.
 
 
 78
 As to that claim the jury was correctly instructed that while a manufacturer is not an insurer of the safety of his product, he has a duty to use ordinary care in its design, and in the selection of materials that go in it, in order to protect those who will likely use it from unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.
 
 
 79
 The jury was also instructed that in determining whether a manufacturer has used ordinary care in the product design and choice of materials it might consider whether the manufacturer conformed to the practices of other manufacturers. The jury was further instructed that both Dulin and Haynes were charged with knowledge of the normal danger of electricity, and that the burden was on the plaintiff to prove by a preponderance of the evidence that the plug alleged to have been unreasonably dangerous contained some danger other than those all electric plugs pose, which was not and would not reasonably be appreciated by an ordinarily prudent person. And the jury was still further instructed that it is not negligence for a person to assume in the absence of knowledge or notice to the contrary that other persons will act with ordinary care, and that it was the duty of all parties involved in the case to use ordinary care for their own safety and for that of others.
 
 
 80
 As to proximate cause, the district court instructed the jury in standard Arkansas terms with respect to proximate cause and concurring causes. With respect to intervening cause, the jury was told:
 
 
 81
 If following any act or omission of a party, an event intervened which in itself caused any damage, completely independent of the conduct of that party, then his act or omission was not a proximate cause of the damage.
 
 
 82
 And in an earlier portion of the charge the jury had been told that the plaintiff could not recover against either Circle F or Pass and Seymour unless it found from a preponderance of the evidence that the plaintiff had sustained damages, that the defendant in question had been guilty of negligence, and that the negligence of that defendant was a proximate cause of the damage.
 
 
 83
 Circle F does not complain here of the form or content of the instructions that have just been abstracted. The defendant's position is that there was simply no substantial evidence that it was guilty of any negligence that was a proximate cause of the accident that caused Dulin's death, and that even if the evidence would justify a finding of initial negligence on the part of the defendant, the evidence nevertheless established as a matter of law that the chain of causation between that negligence and the death of Dulin was effectively broken by one or more intervening causes.
 
 
 84
 The Arkansas law of negligence and proximate cause in the field of products liability is conventional, and we do not believe that either side would quarrel with the summary of governing principles that appears in Rhoads v. Service Machine Co., supra, 329 F.Supp. at 373-76, in which opinion a number of relevant Arkansas decisions are cited. It is true in Arkansas, as elsewhere, that where the negligent acts or omissions of two or more persons actively and efficiently concur to produce injury, the acts or omissions of each actor are deemed to be a proximate cause of the ultimate result. However, where the chain of causation between an original act of negligence and an ultimate injurious result is broken by a new and independent cause, then that cause is deemed to be the proximate cause of the injury, and the original negligence is considered to be but a remote cause. However, the new cause is not considered to be an efficient intervening cause if its occurrence was reasonably foreseeable to the original actor or if his original negligent conduct substantially increased the likelihood of the occurrence of the intervening cause. Rhoads v. Service Machine Co., supra, 329 F.Supp. at 374, and cases cited.
 
 
 85
 We think that the case made by the plaintiff against Circle F was a weak one, and that the case made against Pass and Seymour on the basis of a negligent failure to warn was much stronger. However, we are not able to say that there was no substantial evidence from which the jury could find that Circle F was guilty of negligence in the design of its female connector or in the choice of materials that went into it and that the chain of causation between that negligence and the ultimate death of Dulin was not broken by an intervening cause.
 
 
 86
 Circle F's connectors with their metal backs and metal clamps bonded to the ground wire were sold indiscriminately on the market, and Circle F had no right to assume that its connectors and comparable products of other manufacturers would always be wired by skilled electricians and that there would be no miswiring of connectors or plugs that would cause its female connector to become energized and therefore dangerous to a user. We think that the jury had a right to find on the basis of the evidence before it that Circle F as a manufacturer of ordinary prudence should have foreseen the danger and should have foreseen that its product would become a component part of an electrical assembly or apparatus in connection with which there had been a miswiring and should also have foreseen that the danger created by the miswiring might be enhanced by some other imprudent use of the assembly.
 
 
 87
 We conclude then that the district court did not err in sending the case against Circle F to the jury or in overruling Circle F's motion for judgment notwithstanding the verdict.
 
 
 88
 4. District Court's Refusal to Instruct on Contributory Negligence.
 
 
 89
 Taking up now the final question in the case, we observe that under the Arkansas comparative negligence statute, Ark.Stat.Ann. §§ 27-1730.1 and 27-1730.2, contributory negligence on the part of an injured person is not a complete defense unless it is equal to or greater than the negligence of the party or parties responsible for the injury; if the negligence of the injured party is of less degree than that of his adversary or adversaries, then he is entitled to recover in spite of his own negligence, but in that situation it is the duty of the jury to diminish his award in proportion to his own negligence.[6]
 
 
 90
 In the instant case there was substantial evidence from which the jury could have found, although it would not have been required to find, that Dulin was negligent in calling for the activation of the assembly without removing the baling wire from around the clamp and the spotlight, particularly since Dulin was inside a steel tank and was sitting on an aluminum "pick board." And, if Dulin was negligent, manifestly his negligence contributed to his death.
 
 
 91
 The record reflects that in the course of the trial Circle F submitted a number of written requests for instructions, all of which were denied. One of those requests related to assumption of risk, and another related to "misuse" of the product by Dulin. None of the requests covered contributory negligence.
 
 
 92
 The evidence having been concluded, the district court supplied counsel for the respective parties with copies of the instructions that the court proposed to give. Counsel were advised that after the case had been argued and the jury instructed but before the jury retired counsel would be given an opportunity to object to particular instructions, to request amendments, and to propose additional instructions. See Fed.R.Civ.P. 51.
 
 
 93
 After the arguments and instructions, court and counsel returned to chambers, and in the course of the conference held therein counsel for Circle F requested an instruction on contributory negligence, and dictated the following proposed instruction:[7]
 
 
 94
 The defendant Circle F Industries, Inc. contends that the deceased, John W. Dulin, was negligent in the application of baling wire to the spotlight and electrical apparatus which was a proximate cause of the resulting damages and death of John W. Dulin.
 
 
 95
 It does not appear that the trial judge ruled explicitly on that request, but it was not given, and in point of fact the district court made no changes in the instructions that it had already read to the jury although numerous objections to the charge were made by various parties.
 
 
 96
 Although the instructions that were given to the jury referred generally to the fact that all individuals involved were required to exercise ordinary care for their own safety and for that of others, that instruction was clearly geared to the question of whether Circle F, Pass and Seymour or Haynes had been guilty of negligence; it was not and did not purport to be an instruction on contributory negligence.
 
 
 97
 The particular instruction requested by Circle F was inadequate, and the district court did not err in refusing to give it as dictated to the court reporter. However, we think that the request was sufficient to alert the trial judge to the fact that the defense of contributory negligence, which had been pleaded, was not being waived, and that being so alerted the district court should have given the jury a proper instruction on the issue. See Emery v. Northern Pacific R.R., 407 F.2d 109, 112 n.3 (8th Cir. 1969); Chicago & North Western Ry. v. Rieger, 326 F.2d 329, 334 (8th Cir. 1964); Devitt, Ten Practical Suggestions About Federal Jury Instructions, 38 F.R.D. 75, 77 (1965). See also 9 Wright & Miller, supra, § 2556, at 654-55, where it is said:
 
 
 98
 It is the inescapable duty of the trial judge to instruct the jurors, fully and correctly, on the applicable law of the case, and to guide, direct, and assist them toward an intelligent understanding of the legal and factual issues involved in their search for truth. The court must instruct the jury properly on the controlling issues in the case even though there has been no request for an instruction or the instruction requested is defective.[8]
 
 
 99
 We conclude, therefore, that the judgment against Circle F and in favor of the plaintiff must be reversed and the cause remanded for a new trial of the issues between those parties. In all other respects, the judgment of the district court is affirmed.
 
 
 
 [1]
 In addition to making awards in favor of the plaintiff against Circle F and Pass and Seymour, the judgment finally dismissed all of the claims, cross-claims and third party claims against Weyerhaeuser, McCormick, Hubbell and Haynes. Apart from the issues raised by this appeal, the judgment of the district court has become final. We are not advised why Pass and Seymour chose not to appeal
 
 
 [2]
 As used in this opinion, the unmodified word "plug" includes both male and female plugs or connectors. When a male plug is referred to specifically, it will be identified as a "male plug." A female connector will at times be called a "female plug."
 
 
 [3]
 The contract between Weyerhaeuser and McCormick did not in terms obligate Weyerhaeuser to supply power to the employees of the contractor. However, those employees naturally had no power source of their own, and it was evidently contemplated by the parties that the McCormick crew would be supplied with power from a Weyerhaeuser source
 
 
 [4]
 It appears from the testimony of Wayne R. Bowden, a vice president of Pass and Seymour in charge of engineering and research, that his company sells its plugs without accompanying them with any instructions as to wiring or warnings as to dangers that may result from improper wiring
 
 
 [5]
 The Uniform Contribution Among Tortfeasors Act has been in force in Arkansas since 1941. Act 315 of 1941, Ark.Stat.Ann. §§ 34-1001 et seq
 
 
 [6]
 Arkansas recognizes the common law doctrine of assumption of risk, and where it is established in a products liability case that the injured person "assumed the risk" of injury, there can be no recovery. See Rhoads v. Service Machine Co., supra, 329 F.Supp. at 374 and 378-81. In Arkansas the defense of assumption of risk is not available unless the injured party was actually aware of the danger; here there was no substantial evidence that Dulin knew of the miswiring that has been described or was aware of the danger with which he was confronted
 
 
 [7]
 Supplemental Appendix, page 40
 
 
 [8]
 The practice followed by the trial judge in the instant case of postponing the consideration of objections and requests for additional instructions until after the case has been argued and the jury instructed is a permissible one under Rule 51. However, sometimes the instructions are settled more or less finally prior to the closing arguments. When that course is followed, the response of counsel to a trial judge's invitation to make further requests or objections after the case has been argued and the jury instructed tends to be pro forma since counsel have already had their opportunity to make objections and to request additional instructions or modifications of the ones that the trial judge had proposed to give