UNITED STATES of America, ex rel.
Ted MEANS, Appellee,

v.

Herman SOLEM, Warden, South Dakota
State Penitentiary, Sioux Falls, South
Dakota, Appellant.

No. 79–2017.

United States Court of Appeals,
Eighth Circuit.

Submitted April 18, 1980.

Decided June 27, 1980.

LeAnn Finke, Asst. Atty. Gen., Pierre, S.D. (argued), Mark V. Meierhenry, Atty. Gen., Pierre, S.D., on brief, for appellant.

James D. Leach, Rapid City, S.D., for appellee.

Before BRIGHT and ROSS, Circuit Judges, and SCHATZ, District Judge.*

ROSS, Circuit Judge.

Ted Means was convicted of riot to obstruct justice in violation of SDCL section 22–10–4 [1] and sentenced to thirty months

---

* The Honorable Albert G. Schatz, United States District Judge for the District of Nebraska, sitting by designation.

1. The riot to obstruct justice statute, SDCL 22–10–4, now repealed, provided:

 If the purpose of a riotous assembly was to resist the execution of any statute of this state or of the United States or to obstruct any public officer of this state or of the United States, in the performances of any legal duty, or in serving or executing any legal process, every person guilty of participating in the assembly is punishable by imprisonment in the state penitentiary not exceeding ten years and not less than two years.

imprisonment. The Supreme Court of South Dakota affirmed the conviction. *State v. Means*, S.D., 276 N.W.2d 699 (1979).

Means thereafter filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition Means contended, *inter alia*, that the trial court's refusal to instruct on his theories of self-defense, defense of others, and ignorance or mistake of fact was a denial of due process, right to a trial by jury, and the right to be found guilty beyond a reasonable doubt. The district court,[2] finding that the trial court's failure to instruct on Means' defense theories constituted error of a constitutional magnitude, granted the writ of habeas corpus and ordered that the petitioner be released from state custody.

On appeal, the state contends that the district court erred in ruling that under these circumstances, the petitioner was entitled to instructions embodying Means' theory of defense and that the trial court's refusal to so instruct was an error of constitutional magnitude. For the reasons discussed below, we affirm.

The parties have stipulated to the following facts for the purposes of this appeal. Fed.R.App.P. 10(d).

"On April 25, 1974, a trial was in progress at the Minnehaha County Courthouse in Sioux Falls, South Dakota, in a highly publicized case, *State v. Bad Heart Bull, et al.* [S.D., 257 N.W.2d 715] in which several Native American persons were being prosecuted for alleged participation in a disturbance at South Dakota's Custer County Courthouse in February, 1973. The defendants were represented by one Native American attorney, Ramon Roubideaux of South Dakota, and by two white attorneys from outside South Dakota. All three attorneys refused to proceed with the *voir dire* examination on the ground that they could not conscientiously do so until a ruling was received from the South Dakota Supreme Court regarding the number of peremptory challenges available to them. The ruling was expected within twenty-four hours.

"When the attorneys refused to proceed, presiding Judge Bottum ordered the Native American attorney, Mr. Roubideaux, jailed for twenty-four hours and fined $100. The two white attorneys were dismissed from the case, but were not fined or jailed. Court was dismissed for the day and Mr. Roubideaux was led to jail.

"On April 26, 1974, attorney Roubideaux was returned from jail to court by a police officer who led him by the arm to the defense table. Roubideaux appeared disheveled and unshaven. The spectators in the courtroom rose when Roubideaux was led into the courtroom and sat when he sat. But later that morning, the Indian spectators at the trial refused to rise for Judge Bottum. Judge Bottum ordered the spectators cleared from the courtroom. The spectators were peaceably carried from the courtroom, one-by-one, by plainsclothes [sic] police officers, detectives, and a matron. According to some defense witnesses, some of the women carried from the courtroom were fondled by some of the police.

"On April 29, 1974, meetings were held among the defendants, their attorneys, and their supporters at the Van Brunt Building in downtown Sioux Falls. The prosecution presented one witness, Kenneth Dahl, concerning the contents of those meetings. Mr. Dahl testified that Russell Means told people not to stand for Judge Bottum the next day, to be 'prepared to do battle' and that the signal would be 'made for a broken window on the upstairs side of the courtroom for people outside to know that the fight had started inside,' and that an Indian lady 'agreed to drive up with a carload of debris to throw at the courthouse.'

"The defense's version of the events of April 29 was very different. Three defense witnesses, including one attorney,

2. The Honorable Fred J. Nichol, Chief Judge, United States District Court for the District of South Dakota.

testified that at the meetings on April 29 no violence whatsoever was planned for the next day, and that the purpose of the persons in the courtroom refusing to rise for the judge was to express their protest against what they believed to be his racism and racism in the South Dakota courts against Indian people. These witnesses testified that men only were to be sent to fill the twenty seats (which Judge Bottum had announced was all he would allow to spectators) because violence by the Sioux Falls police was feared.

"There was no evidence that Ted Means was present at the Van Brunt Building, or even in Sioux Falls, on April 29, or on April 25 or 26, 1974.

"On April 30, a number of Indian spectators entered Judge Bottum's courtroom and refused to stand for Judge Bottum. He subsequently ordered the courtroom cleared.

"Between the time that Judge Bottum entered the courtroom, which was about 9:30 a. m., and the time that the Sioux Falls police Tactical Squad entered the courtroom, which was about 11:20 a. m., various activities ensued in the courtroom, including discussion, negotiation, and prayer. According to the testimony of a prosecution witness, there was some communication between the Indian spectators in the courtroom and the people gathered outside.

"The spectators who entered the courtroom on April 30 did not enter directly from the hall outside the courtroom into the courtroom. The door from the hall to into the courtroom was locked that morning. The spectators entered the courtroom by passing through a door to a room adjacent to the courtroom where they were frisked and put through a metal detector, and then by passing through a back door into the courtroom.

"At about 11:20 a. m., the Tactical Squad, equipped with jumpsuits, helmets with face shields, combat boots with steel toes, forty-inch nightsticks with steel-ball ends, gloves with metal in the knuckles, gas masks, firearms, handcuffs and mace entered the courtroom. The Tactical Squad consisted of twenty to twenty-four members. The Tactical Squad was only a portion of the approximately forty-five to fifty law-enforcement personnel in the immediate area of the courthouse.

"Prior to the entry of the Tactical Squad into the courtroom there was a general lack of instruction of the Tactical Squad members as to what they were supposed to do and how they were supposed to do it. Although apparently the ranking police officers knew that the spectators had passed through a metal detector and been frisked, the Tactical Squad members themselves were not aware of this.

"The press was removed from the courtroom just before the Tactical Squad came in.

"A prosecution witness, Tactical Squad member Ideker, testified that the first violence occurred when Russell Means struck him. Ideker also testified that others in the courtroom could have perceived that Ideker himself was the aggressor in his confrontation with Russell Means.

"Five defense witnesses testified that the first violence occurred when Russell Means or David Hill, a defendant in the *Bad Heart Bull* trial itself, was struck by a Tactical Squad member. Defense witness Tom Cook testified that the first Tactical Squad member in the courtroom 'went into' Russell Means with his baton as though it were a hockey stick and that Russell Means put his hands up and went backwards. Cook testified that immediately after this, Ted Means was 'kind of standing' and 'as soon as Russell was hit . . . Ted was hit and pretty soon the next moment Ted was lying down on the ground without any more struggle.' Cook testified that the spectators stood up just before the Tactical Squad got to them and stood up because the Tactical Squad was coming in at a fast gait. Cook testified that Ted Means may have grabbed an arm of a Tactical Squad member after he was struck.

"Defense witness Bishop Bruno Schlachtenhaufen testified that the Tactical Squad came into the courtroom at a fast pace. He testified that it was a surprise to everyone when the Tactical Squad entered the courtroom, and that there was no opportunity for people to leave. He testified that the Tactical Squad came at the spectators with their clubs. He testified that the reaction of the Indian spectators to the Tactical Squad was a defensive reaction. He testified that the first two Tactical Squad members 'attacked' David Hill, then 'knocked him down and moved on.' The next thing he saw was a confrontation between Russell Means and a Tactical Squad member, and immediately thereafter all the people in the first two rows of the courtroom 'joined in the resistance.'

"Defense witness Reverend William Weber testified that the entry of the Tactical Squad was 'unexpected after an hour and a half of waiting,' and that it was 'swift and without any reissuance of an order to stand up or to get out of the courtroom' and that 'there was an almost spontaneous and simultaneous reaction on the part of everyone else in the courtroom and we simply rose instinctively.' He testified that he believed that everyone who rose 'was frightened and concerned about his survival.' He testified that the first Tactical Squad member attempted to force Russell Means against the wall and lodged his club under Russell Means' chin. He knew Ted Means, but did not see him get struck or strike anyone.

"Defense witness David Hill testified that the Tactical Squad came into the courtroom very fast. He testified that the first Tactical Squad members shoved and pushed him, and that he was then shoved and hit from behind and then knocked unconscious. His eye was badly damaged by the Tactical Squad. As a defendant in the *Bad Heart Bull* trial itself, Hill of course had an obligation to be in the courtroom, and was not included in Judge Bottum's order to clear the spectators.

"Defense witness Bishop Archie Madsen testified that the Tactical Squad came into the courtroom at a running pace. He testified that he did not actually see David Hill being struck, but did see him lying face down in the courtroom as two Tactical Squad members went by. He described the action of the Tactical Squad against the Indian spectators as being 'like attacking a flea with a shotgun.' [3]

"[3] In its closing argument to the jury, the prosecution argued that the defense witnesses who testified that the Tactical Squad members were the initiators of violence were not lying, but were just mistaken about what happened, since they had been seeing with their 'heart' as opposed to seeing with their 'eyes.'

"All witnesses, prosecution and defense, agree that after the initial conflicts a wild fight ensued. A Tactical Squad member, Myers, testified that he separated Ted Means from an unidentified Tactical Squad member, and that Ted Means then took one swing at him, that Myers sidestepped it and then struck Ted Means with a 'butt stroke' to the left side of the head, knocking him to the ground, at which time he was arrested.[4] Ted Means received a 'goose egg' size bump on his head as a result.

"[4] This testimony by Myers, and the testimony by Tom Cook, summarized at pp. 8–9 hereof, was the only testimony in the trial specifically referred to Ted Means, out of a total of 1400 pages of trial transcript." [Footnotes 1 and 2 omitted.]

"People outside the courthouse became aware of the melee. Some threw objects at the courthouse, breaking glass doors and windows. The prosecution contended that this was part of a conspiracy with the people inside the courtroom. Several people who allegedly were outside the courthouse that day were charged with crimes, but the charges were dismissed prior to trial.

"The events of April 30, 1974, were widely publicized throughout Minnehaha County and the State of South Dakota. It was against this background of wide publicity that Ted Means was tried for riot to obstruct justice."

Means made a timely request for several instructions relating to his theory of the case:

Defendant's Requested Instruction No. 7:

Where a person is being unlawfully assaulted and is exercising his right to lawful self-defense, any other person may lawfully come to their defense. A person coming to the defense of another may lawfully use any force or violence which the person attacked is justified in using in his own self-defense. He is privileged to use whatever violence on the assailant as is reasonably necessary to prevent the threatened injury.

Defendant's Requested Instruction No. 8:

The defendants have the burden of introducing evidence as to the justification for self-defense. When the defendants introduce such evidence, the state then has the burden of proving beyond a reasonable doubt that the alleged justification for self-defense did not exist.

Defendant's Requested Instruction No. 26:

It is lawful for a person who is being assaulted, and who has reasonable ground for believing that bodily injury is about to be inflicted upon him, to stand his ground and defend himself from such attack, and in doing so he may use all force and means which he believes to be reasonable and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent.

Defendant's Requested Instruction No. 27:

A person who has been attacked and who is exercising his right of lawful self-defense is not required to retreat, and he not only may stand his ground and defend himself against the attack but also may pursue his assailant until he has secured himself from danger if that course appears to him and would appear to a reasonable person in the same situation, to be reasonably and apparently necessary; and this is his right even though he might more easily have gained safety by withdrawing from the scene.

When the trial judge refused these written requests for instruction on self-defense and defense of others, Means' counsel made an oral request that South Dakota Pattern Jury Instruction Vol. II, § 2–14–9h be given:

The right of self-defense exists only as against an unlawful attack. The right does not exist, even though bodily injury appears probable, as against a person who, in threatening or appearing to threaten injury, is acting unlawfully.

But the trial court had made it clear that all instructions on self-defense would be rejected:

It is the Court's position that if any self defense instructions were allowed it would have been 2–14–9h which is an instruction on self defense against an unlawful act and the Court has reviewed that situation in 77 C.J.S. 12 and 54 Am. Jur., Section 13, page 513. And for that reason, did not give any instruction on self defense.

The trial court also rejected a requested jury pattern instruction on ignorance or mistake of fact:

Defendant's Requested Instruction No. 25:

An act committed or an omission made under an ignorance or mistake of fact which disproves any criminal intent is not a crime.

Where a person in good faith believes in the existence of certain facts, and acts or omits to act with reference to such believed facts in a manner which would be lawful if the facts were really as he believes them to be, he is not guilty of crime, although his act or omission is such that if committed or made by one who knew the true facts it would constitute a criminal offense.

■ The district court concluded that the state trial court's failure to instruct the jury regarding self-defense, defense of others and ignorance or mistake of fact denied the petitioner his "right to trial by jury and his due process right which required the prosecution to prove him guilty beyond a

reasonable doubt." *Means v. Solem,* 480 F.Supp. 128, 138 (D.S.D.1979). We agree that the trial court's failure to give instructions on self-defense and defense of others was a denial of the petitioner's right to due process.

### I. The Jury Instructions—Theory of Defense.

 It is well established that a defendant in a criminal case is entitled to an instruction on his theory of the case if there is evidence to support it and a proper request is made. *United States v. Manning,* 618 F.2d 45, 47–48 (8th Cir. 1980); *United States v. Rabbitt,* 583 F.2d 1014, 1024 (8th Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). A proper request is one which is timely, is supported by the evidence and sets forth a correct statement of the law. *United States v. Brake,* 596 F.2d 337, 339 (8th Cir. 1979).

There is no question that Means' request for his theory of defense instructions was timely. The state contends, however, that Means' requested instructions incorrectly stated the law of self-defense under these circumstances and that his defense was unsupported by the evidence.

### A. Correct Statement of the Law.

In affirming Means' conviction, the South Dakota Supreme Court made it clear that "[u]nder some fact situations, self-defense may be a valid defense to the charge of riot to obstruct justice." *State v. Means,* S.D., 276 N.W.2d 699, 701 (1979). That interpretation of South Dakota law clearly refutes the state's argument that "as a matter of law" Means was precluded from asserting his theory of self-defense.[3]

 The state contends that the requested self-defense instructions were improper because each refers to the actions of the

Tactical Squad as an unlawful attack or an assault. To the extent that the defendant's proffered instructions fail to explain that in accordance with SDCL section 22–18–2,[4] a policeman's use of force becomes unlawful only when it becomes greater than that necessary for the performance of his legal duties, we agree that they are inadequate statements of the law involved in this case.

Nonetheless, we believe that the defendant's request was sufficient to alert the trial judge to an important omission in his charge going to the fundamental fairness of the trial. Being so alerted, the trial court should have given a proper instruction on the issues of self-defense. *Dulin v. Circle F Industries, Inc.,* 558 F.2d 456, 469 (8th Cir. 1977).

 There were facts adduced at trial from which a jury could find that the Tactical Squad used *unnecessary* force and therefore, unlawful force in contravention of SDCL 22–18–2 in attempting to remove the spectators from the courtroom. Bishop Archie Madsen testified that "it appeared to me it was like attacking a flea with a shotgun to come into the courtroom where Indians had been totally searched, had no weapons of their own with them in any way, and for a tac squad to come in with all the equipment they had, was to me an excessive use of power." The South Dakota statute provides only that the police were entitled to use *necessary* force. We believe the jury could have found, from the facts of this case, that more force than *necessary* was used, so that the defense of self-defense was available to Means.

At least one of the requested instructions, the Jury Pattern Instruction, was a correct statement of the law of South Dakota on self-defense. Coupled with an instruction relating the elements of SDCL section 22–

---

**3.** South Dakota law makes no distinction among those allowed to defend themselves and coming to the defense of another. *State v. Grimes,* S.D., 237 N.W.2d 900, 902 (1976). Accordingly, we discuss the petitioner's requests for instructions on self-defense and defense of others interchangeably.

**4.** SDCL section 22–18–2 provides:

> To use or attempt or offer to use force or violence upon or toward the person of another is not unlawful when necessarily committed by a public officer in the performance of any legal duty or by any other person assisting him or acting by his direction.

18–2, that instruction on self-defense or defense of others would have adequately apprised the jury of Means' theory of self-defense. Thus, a proper instruction would have been the requested Jury Pattern Instruction coupled with an instruction relating the elements of SDCL section 22–18–2 on the necessary use of police force.

The state argues that the petitioner, by his own conduct, forfeited any right to claim self-defense, defense of others, or ignorance or mistake of fact as defenses. It urges that Means was precluded from invoking those defenses because he intentionally remained in the courtroom in disregard of the trial court's order to leave.

██ Under South Dakota law, the right of self-defense is not available to one who "provoke[s] an assault." *State v. Keliher*, 46 S.D. 484, 194 N.W. 657, 658 (1923); *South Dakota Pattern Jury Instructions*, Vol. II, 2–14–9i, c (1970). Whether Means' form of protest by virtue of a peaceful sit-in in the courtroom was tantamount to provoking a violent confrontation, as the state contends, is highly questionable but was a question of fact for the jury under proper instructions.

██ From the evidence adduced at trial, the jury could have found that the violent confrontation which ensued was not "provoked" by the Indian spectators. Only four days earlier, a number of Indian spectators had been *peacefully* carried from the courtroom, primarily by plainclothes officers, without incident, when they refused to clear the courtroom after being ordered to do so following a planned protest similar to that involved in this instance. It would have been reasonable for the Indians to assume, in planning the instant protest by again refusing to rise, that this protest might also be met with their peaceful removal and not with a violent clash with the police. Moreover, Officer Richard Ideker testified that

Q Do you think there is any way that any other person could have perceived your actions even though you might not have intended it as being such as being aggressive, making the first move so to speak?

A Depending on the point of view, I suppose somebody in the, let's say if they were back in that corner, might have a different view of me trying to pass by Russell, * * *.

\* \* \* \* \* \*

Q You also indicated that someone in the back of the courtroom could have gotten a different impression from what you said about going around Russell Means but you didn't believe Russell Means could have had that impression, is that your testimony?

A Yes, sir, it is.

We agree with the district court that the petitioner had no right to defend himself or others from the lawful use of such force as was necessary to remove him and the other spectators from the courtroom. Such force was indeed invited by the petitioner.

However, the Sioux Falls Tactical Squad was not authorized to use unlawful force in removing the spectators who remained seated in the courtroom. If the police were the aggressors in using unnecessary, unreasonable, or excessive force it was unlawful and certainly uninvited by peaceful disobedience to a court order. Therefore the fact that the petitioner and the other spectators peacefully remained in the courtroom in violation of a court order, the act which the South Dakota Supreme Court called provocation, only invited or provoked the use of lawful or necessary force by the police in performing their duty of removing the spectators. It did not remove the theory of self defense or defense of others if there was evidence that the police were the aggressors in using unnecessary or excessive force which the petitioner reasonably believed could lead to bodily harm.

*Means v. Solem*, 480 F.Supp. 128, 136 (D.S. D.1979).

The state claims that Means was precluded from asserting the defense of self-defense because, in an unlawful resistance to

arrest context such as this, there was an absolute duty to retreat regardless of whether the force used to effect the arrest was excessive. We disagree.

The state's rationale assumes that there was time and an opportunity to retreat. As the state contends, following the trial court's order to vacate the courtroom, an hour and a half elapsed during which the spectators could have voluntarily left the courtroom. Once the Tactical Squad entered the courtroom, however, unannounced and arguably unexpected after such a long and peaceful wait, there may not have been time to retreat. Some of the evidence so indicates. Pastor William Walter Weber testified that:

A Well, the entry was so, first of all unexpected after an hour and a half of waiting, it was not expected when it finally occurred, and it was so swift and without any reissuance of an order to stand up or to get out of the courtroom or without any threat kind of stiffening that order, the entrance was so swift that there was an almost spontaneous and simultaneous reaction on the part of everyone else in the courtroom and we simply rose instinctively. It's kind of like flinch when someone hits you, you react, and that was the kind of thing that occurred and the first officer simply came in from the door and there was a serpentine single file line until about the center of the courtroom of this section of the courtroom where there were other people, defendants and lawyers and then the single file was disturbed, but the first officer with his club outstretched advanced through this section of the courtroom to where Russell Means was standing in the aisle right by the first row of spectators and against the window wall and then there was a person to person engagement between Russell Means and that officer and there was a simultaneous and instantaneous engagement between the other officers and people in this section of the courtroom.

\* \* \* \* \* \*

The first officer with his club outstretched attempted to force Russell Means back against the windowed wall and lodged the club under his chin.

Weber had described the incident in a newspaper editorial read into evidence as follows:

"Then it happened. So fast and so furious and so formidable was the entrance of the special tactical force that everyone present scarcely had time instinctively to rise and run for cover or assume some protective posture. A serpentine line of policemen advanced immediately with riot clubs held on both ends, outstretched, and aimed to lodge beneath the chins of those to be forcibly menaced or moved from the room. No alternative attempts whatever were made to remove Indian persons individually without the persuasive use of clubs. No efforts were made to prevent Indian persons from moving to the courtroom area up front and past a dividing rail to movable chairs which might be used for weapons. Pandemonium almost instantly occurred, and swinging clubs, flying chairs, shattering glass, spraying mace, stampeding bodies and anguished cries characterized a courtroom scene never to be forgotten by anyone present."

Finally, he testified that "It was my impression that everyone who rose was frightened and concerned about his survival."

Officer Richard Ideker testified:

Q And did you see some try that door and find it to be locked and then move to the other hallway door?

A Yes, sir.

Q Okay. Did it appear to you that those people were attempting to leave the courtroom?

A Yes, sir. In fact, I think there was a slight problem with the door at this corner of the courtroom and somebody said, you know, hey, the door is shut, or we can't get the door open, so we just maintained a position until they could get the door freed at least.

We simply cannot accept the state's argument that there is never any right of self-defense available to a person engaged in an obstruction of justice notwithstanding an alleged excessive use of force in effecting that person's removal pursuant to court order.

■ Under the circumstances involved in this case, we believe that the request for an instruction on self-defense was proper. Petitioner's requested Jury Pattern Instruction on self-defense, although misleading in the absence of an accompanying instruction regarding the necessary use of police force, was sufficient to alert the trial judge to the need to charge the jury on both of these issues. We are also satisfied that petitioner's theory of self-defense was available on these facts under South Dakota law.

#### B. Evidence to Support the Instruction.

Next, we must consider whether there was evidence to support the requested instructions. Where there is evidence to support a properly requested instruction, the defendant is entitled to a jury charge relating to his theory of defense. *United States v. Brake, supra,* 596 F.2d at 339.

In this case, substantial evidence supports Means' theory that the spectators acted in self-defense. Bishop Bruin Schlactenhaufen testified:

> There was no hesitance on the part of the tactical squad. I guess I had expected, you know, if this happened, in the first place it was all a surprise but I had expected that there would be a hesitance, an opportunity for these people to be allowed to leave or urged to leave but there was no hesitance, it was just coming at them with the clubs. And then there was a reaction, a defense reaction and about the same moment all of those observers joined in a resistance. It was a very shocking melee, * * *.

In contrast, he described the sit-in demonstration of April 26th as "handled very well * * *. The local police * * * had been well trained. There was no resistance, it was peaceful. * * * I have to say I have never seen anything like this * * * kind of force used on people that were disarmed."

■ We conclude that the evidence adduced at trial justified jury instructions relating to the petitioner's theory that he acted so as to protect himself or other Indian spectators from real or perceived excessive force by the Tactical Squad in effecting the spectators' removal from the courtroom.[5]

■ Means' request for an instruction on ignorance or mistake of fact was properly denied. Means offered the instruction in support of his theory that he lacked the requisite specific intent element necessary to convict for riot to obstruct justice.

There is no evidence to support this request. Witnesses for the defense testified that the spectators acted defensively, not that they acted in the mistaken belief that they had a right to remain in the courtroom. Any mistake of fact would have gone to whether the spectators had a right to act in self-defense under these circumstances. Moreover, the trial judge offered four instructions pertaining to mutual intent, specific intent, means of manifesting intent, and common intent in the context of a riotous assembly. It also instructed the jury on the presumption of innocence, the prosecution's burden of proving the defendant guilty beyond a reasonable doubt, and the elements to be proved under the riot to obstruct justice statute.

■ We are satisfied that these instructions adequately admonished the jury to find Means innocent if they found that he lacked the intent to commit an obstruction of justice as required under the riot to

---

**5.** The state courts found that there was no evidence to support instructions on any of petitioner's defense theories. The district court concluded otherwise, finding that

> [t]he state court's decision that there was no evidence to support the requested instructions is a conclusion of law. Even giving deference to the trial court's rulings, this

court is not bound by that decision. Although a state court's findings of fact are presumptively valid in a habeas corpus review, a state court's conclusions of law are not binding for the "state court 'may have misconceived a federal constitutional right.' " *Means v. Solem,* 480 F.Supp. 128, 135–36 (D.S.D.1979).

obstruct justice statute. It was therefore not error for the trial court to refuse this instruction.

## II. Constitutional Magnitude of the Trial Errors.

■ Our finding that there was evidence to support instructions on self-defense and defense of others, and that a proper request for such instructions was made, is insufficient, by itself, to grant habeas corpus relief. We must also find that the error in refusing to instruct the jury in this case was of a constitutional magnitude. Habeas corpus relief may be granted only if the error in refusing to instruct the jury in this case was of a constitutional magnitude. *Spratlin v. Solem*, 577 F.2d 56, 60 (8th Cir. 1978).

The general rule is that only issues of constitutional magnitude are cognizable in habeas corpus. The claim must allege a "fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure" in order to be considered on a petition for a writ of habeas corpus. *Hill v. United States*, 368 U.S. 424, 428 [, 82 S.Ct. 468, 471, 7 L.Ed.2d 417] (1962).

*DeBerry v. Wolff*, 513 F.2d 1336, 1338 (8th Cir. 1975).

■ We believe that the omission of the requested instruction on self-defense and defense of others, "evaluated in light of the totality of the circumstances," *Kentucky v. Whorton*, 441 U.S. 786, 789, 99 S.Ct. 2088, 2090, 60 L.Ed.2d 640 (1979), so infected the "entire trial that the resulting conviction violates due process," *Zemina v. Solem*, 438 F.Supp. 455, 469 (D.S.D.1977), *aff'd*, 573 F.2d 1027 (8th Cir. 1978). In *Kentucky v. Whorton, supra*, 441 U.S. at 789, 99 S.Ct. at 2090, the Supreme Court held that the failure to give a requested instruction on the presumption of innocence

does not in and of itself violate the Constitution * * * such a failure must be evaluated in light of the totality of the circumstances—including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence

was overwhelming, and other relevant factors—to determine whether the defendant received a constitutionally fair trial.

Applying the standards delineated in *Whorton* to the trial court's refusal to instruct on petitioner's theory of self-defense, we hold that the refusal to so instruct in this case resulted in an unfair trial. Of the instructions given, none relates Means' theory of self-defense. And the instructions given as to the intent required for conviction do little to bring Means' theory before the jury.

Failure to give a theory of defense instruction is harmless error only where the failure to instruct could not have affected the outcome of the trial "beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). In view of the totality of the circumstances in this case and the evidence supporting the petitioner's theories of self-defense and defense of others, the request for an instruction on those theories should not have been denied. We cannot say that the failure to instruct on self-defense and defense of others in this case could not have rendered Means' trial unfair beyond a reasonable doubt.

We therefore affirm the judgment of the district court.