THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, *v.*
JOHN LUKUS, DEFENDANT AND APPELLANT.

No. 11161.
Submitted December 12, 1966. Decided January 20, 1967.
423 P.2d 49.

Howard C. Foreman (argued), Billings, for appellant.

Forrest H. Anderson, Atty. Gen., James R. Beck, Asst. Atty. Gen (argued), Helena, John L. Adams, Jr., (argued), County Atty., Billings, for respondent.

MR. JUSTICE DOYLE delivered the Opinion of the Court.

Defendant appeals from a conviction by a jury of the crime of assault in the first degree and from denial of his motion for a new trial by the District Court of Yellowstone County.

Sometime between 12:30 and 1:00 a. m., January 9, 1966, the manager of defendant's apartment dwelling received complaint about a disturbance in defendant's apartment. The manager responded by twice going to defendant's door and asking him to be quiet. These requests were met with cursing and increased noise and a statement by the defendant that he would do as he pleased. The manager then informed the defendant that he would call the police. When the disturbance continued the manager went to the residence of the owner of the apartment building who called the police.

Officers Pace and Bracken of the Billings Police Department responded to the call and were directed by the manager to the defendant's apartment. When the officers knocked on the defendant's door for the first time there was no disturbance in progress. They knocked several more times and announced that they were police officers and had come to investigate a complaint of a disturbance. The defendant made no response whatever and did not open his door as requested.

The officers made no mention of an intention to arrest the defendant. No complaint had been signed against the defendant and no warrant had been issued for his arrest.

The defendant testified that he had asked the officers to slide their identification cards under the door but the two officers and the man living in the adjacent apartment testified that there was no sound from behind the defendant's closed apartment door.

The officers asked the manager if he had a key to the defendant's door. Several keys were produced and tried. Officer

Bracken testified that he was the one who used the correct key and opened the defendant's door. After being unlocked the door swung free until it hit the end of the chain of the night latch leaving an opening of about four inches.

After the door was opened there was a response from inside the defendant's apartment. The testimony of the two officers and the man living in the adjacent apartment is not clear as to the exact words used. The essence of their testimony is that the defendant was heard cursing generally and twice repeating that he would "get" or "kill" those outside the door. The defendant denied the threats and testified that he warned the officers to get away from the front of the door. The officers remained where they had been, in front of the defendant's door, fully uniformed and visible in the lighted hallway.

The light that had been on behind the defendant's partially open door went out and the officers attempted to investigate the inside of the apartment by shining their flashlights through the four-inch opening. As they investigated in this manner they continued to state that they were police officers and desired to talk with the defendant. Suddenly a shot was fired through the door which hit Officer Pace in the cheek just below his left eye. The first shot was followed by a pause and a volley of four more shots fired in regular succession. The officers moved to safety and help was summoned through the patrol car radio. Help came in the form of several additional policemen one of whom took Officer Pace to a local hospital for medical attention.

After an attempt to kick in defendant's door failed one officer fired three shots and another officer fired a single shot into the upper right hand corner of the door. After the fourth shot the defendant responded to the officers' command to come out with his hands raised. Defendant was arrested, handcuffed and bodily dragged and carried to a police car because he refused to go under his own power.

After the defendant was arrested and removed to police

headquarters an investigation of the premises was conducted by members of the Billings Police Department. A 22 caliber pistol with five spent cartridges and one live round was found. The apartment also contained several empty beer and liquor containers.

Officer Pace's injuries were amazingly minor. The bullet passed completely through his flesh while only grazing his cheek bone. He was back on duty as a policeman after a week's convalescence.

There was ample evidence at the trial that the defendant had drunk a considerable quantity of beer and liquor just prior to the incident in which Officer Pace was shot. The defendant gave a statement and testified that he had been drinking earlier in his apartment with his mother and that he had taken her home in a cab, had some more to drink in a bar and returned home and continued to drink. The arresting officers testified that they could tell that the defendant had been drinking from his actions and because the defendant smelled of liquor.

The information charging the defendant with first degree assault was filed January 10, 1966. Defendant asked for and received court-appointed counsel. After a three-day trial, the jury returned a verdict of guilty as charged by the information. Defendant was sentenced to a term of ten years in the state penitentiary . A motion for a new trial by defendant was denied and this appeal was then perfected.

In addition to denying the charge against him generally, defendant asserted the defense that "his home was his castle" and that he was therefore privileged to use a gun in the manner charged by the information to protect against a trespass. Defendant also relied upon section 94-119, subd. (1), R.C.M.1947, by maintaining that he was too intoxicated to have been able to form the requisite specific intent to commit the crime of first degree assault.

Defendant specifies error because the court did not instruct the jury, as a matter of law, that prior to the shooting, officers

Pace and Bracken were acting illegally because they were not in the process of making a lawful arrest at the time they opened defendant's door. Defendant further contends that the court should have instructed the jury that the unlawful acts of the policemen constituted a trespass which the defendant was entitled to forcibly resist.

Section 94-6003, R.C.M.1947, provides that a peace officer may make an arrest only in obedience to a warrant or without a warrant: "(1) For a public offense committed or attempted in his presence; (2) When a person arrested has committed a felony, although not in his presence; (3) When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it; (4) on a charge made, upon a reasonable cause, of the commission of a felony by the party arrested; (5) At night when there is reasonable cause to believe that he has committed a felony." The jury was instructed according to the foregoing statute. However, it would be difficult to find any evidence that would support a finding of an arrest attempted prior to the shooting based on this statute. When the officers arrived no disturbance was in progress. They had no warrant for the arrest of the defendant and they at no time informed the defendant that they intended to arrest him as would be required by section 94-6008, R.C.M. 1947.

It does not follow, however, that the act of opening defendant's door was unlawful and a trespass. The law's traditional high regard for the security of persons, within the confines of their dwelling places, is the unquestioned source and truth of the saying that "a man's home is his castle." This court has afforded its full protection to the security of property and dwelling places. See State v. Nickerson, 126 Mont. 157, 247 P.2d 188. But at times it must be recognized that this protection is not boundless. The technical rules of trespass are literally replete with exceptions which are usually stated as "privileges." A large number of the commonly accepted "privi-

leges to enter land" are set forth in topic 2 of chapter 8, Restatement of Torts 2d, §§ 191-211.

The evidence warrants the assumption for the purposes of this opinion that the officers did not open the defendant's door pursuant to an attempt to arrest him. Therefore, the question is how far can an officer of the law probe into the dwelling of another while investigating a complaint in the course of his official duties without committing an unlawful act?

A somewhat similar situation is discussed in People v. Roberts, 47 Cal.2d 374, 303 P.2d 721, where police officers went to the door of an apartment and received no response. While standing there waiting the officers heard what they thought were moans and groans. They entered and found no one. While holding the entry to be unlawful the court said, "Necessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose."

In the instant case officers Pace and Bracken were presented with several reports of a great disturbance apparently caused by a single man. But as they attempted to investigate they received no response from the inside of the apartment which had been reported to contain a cursing, raging man. Under such circumstances the officers may very well have been prompted by the belief that something serious had happened to the occupant of the apartment and that he might have been in need of help. For this reason it cannot be held, as a matter of law, that the two officers were not privileged to open the defendant's door. A jury could have found that the slight opening of the door by police officers for the purpose of determining what had happened to cause a raging man to fall silent was privileged as an act of necessity and within their official duties.

It is necessary to add the caveat that the privilege to enter as a matter of necessity is a limited privilege. The facts of this case place it near the fringe of the privilege. Police

officers are in all cases required to have reasonable grounds to believe that a necessity exists before they are entitled to rely on a privileged entry.

Even if it were conceded that the officers were trespassing when the defendant discharged his firearm the defendant may still be guilty of first degree assault if he exceeded his privilege to resist. A citizen of this state is authorized to use force by two statutes. Section 94-5002, R.C.M.1947, provides: "Resistance sufficient to prevent the offense may be made by the party about to be injured—

"(1) To prevent an offense against his person, or his family, or some member thereof;

"(2) To prevent an illegal attempt by force to take or injure property in his lawful possession."

Section 94-605, R.C.M.1947, provides that: "To use or attempt or offer to use force or violence upon or towards the person of another is not unlawful in the following cases: * * * "(3) When committed either by the party about to be injured, or by another person in his aid or defense, in preventing or attempting to prevent an offense against his person, or a trespass or other unlawful interference with real or personal property in his possession, if the force or violence used is not more than sufficient to prevent such offense." Both statutes authorize the use of force only to the extent to which it is necessary to prevent the offense. Therefore the question presented is whether the defendant exceeded the force necessary to prevent the continuation of a trespass or an offense against his person when he fired his pistol into the door. State v. Daw, 99 Mont. 232, 43 P.2d 240, it was held that a person may act upon appearances to meet force with force and to even slay his assailant and it does not matter that he was not in real peril if under the circumstances he acted reasonably. The jury was properly instructed on the rule just restated from the Daw case, supra, and it must be presumed that the jury did consider all of the evidence relevant to the circumstances as

they appeared to the defendant just prior to the time he discharged his firearm.

The evidence that the jury might have considered with respect to the extent of the force used is more than sufficient to support a finding that the force used by the defendant was excessive. On two occasions the defendant was asked to cease the disturbance he was making. He was then told that the police would be called. Several minutes passed and the defendant then heard men knocking at his door claiming to be police officers and asking to talk with the defendant. The defendant's door was not forced open nor was there any disturbance which might have justified the conclusion that peril was only moments away. On the contrary, the record is consistent in its showing that the door was opened with a key and then only a few inches to the point where it was held by the chain of the night latch. No attempt was made to force the door beyond the limits of this chain and it remained in place until the defendant opened the door himself. While the door was in this partially opened position the defendant was not menaced but was again assured that the persons on the other side were police officers. The testimony of the police was that during the entire period the defendant refused to communicate and therefore did not attempt to verify their identity. Defendant's only discernible responses were cursing and five shots from a 22 caliber revolver.

The jury was fully instructed on defendant's right to use force under section 94-5002, R.C.M. 1947, and therefore defendant's offered instruction number 8 would have added nothing. It is not error for a court to refuse an offered instruction when its legal theory is covered by one or more of the instructions given and the substantial rights of the defendant are thereby protected. State v. Lagge, 143 Mont. 289, 388 P.2d 792.

Defendant also contends that the court should not have given instruction 17 because it deprives the defendant of his

right to require the State to prove the element of specific intent. Instruction 17 was given as follows: "You are instructed that in every crime or public offense there must be a union or joint operation of act and intent. The intent or intention is a state of mind and every sane person is presumed to intend the natural and probable consequences of his act, and such intent may be inferred from the acts of the person charged with crime as well as by his words or declarations. It is not necessary to a conviction that an express intention be proved. It may be manifest by circumstances connected with perpetration of the offense without any positive testimony as to express intent." The objection to this instruction centers around the last two sentences and particularly the term "express intent." Defendant interprets the use of "express intent" here to mean the intention to commit the crime charged. This interpretation is difficult to accept in the abstract and even more difficult when taken in context of the entire instruction. Webster's Third New International Dictionary's first definition of the word "express" is, "directly and distinctly stated or expressed rather than implied or left to inference." Where the instruction states that it is not necessary that an express intent be proven it is merely making a negative restatement of the preceding sentence which states that intent may be inferred from the acts of a person. It does not seem likely that this would be confusing or misleading to a jury which had the benefit of the whole instruction. Interpreted in this manner, instruction 17 is a correct statement of the law as provided in section 94-118, R.C.M. 1947.

Defendant also contends that the evidence is insufficient to sustain a conviction of first degree assault because the record clearly shows that the defendant was in an intoxicated condition. Defendant concludes that under the authority of section 94-119, subd. (1), R.C.M. 1947, he could only be convicted of some lesser degree of assault if any.

Section 94-119, subd. (1), provides: "No act com-

mitted by a person while in a state of voluntary intoxication is less criminal by his being in said condition. But, whenever the actual existence of any particular purpose, motive, or intent, is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act." Under this provision a jury might find that the accused was so intoxicated that he was unable to form a specific criminal intent as distinguished from a general criminal intent. State v. Palen, 119 Mont. 600, 178 P.2d 862; Alden v. State of Montana, D.C., 234 F.Supp. 661. Section 94-119, subd. (1), is applicable to this case because the definition of first degree assault contained in section 94-601, R.C.M.1947, requires the specific intent to kill a human being or to commit a felony on the person or property of the one assaulted.

The court, in its instruction number 18, submitted section 94-119, subd. (1) to the jury verbatim. Therefore the only question that remains with respect to the defendant's alleged intoxication is whether the jury had sufficient credible evidence to support a finding that the defendant was able to form the specific intent to commit the crime of first degree assault. The defendant is now placed in the curious position of claiming sufficient mental competence to execute a plan to forcibly protect his dwelling and himself from a trespass on one hand and on the other, that he was so intoxicated as to be unable to form the intent requisite to first degree assault.

The record contains considerable evidence of activity by the defendant which the jury might have used to determine the degree of his intoxication. When the door was opened to the limit of the night latch the defendant turned off his lights inside the apartment and by his own testimony reached into a near-by drawer to get his revolver and prepare it for action. In contradiction to the defendant's testimony that he aimed low, the photographs show that his shots struck the door near

the level of the doorknob. Later the defendant was apparently able to conclude that he was overpowered by the police fire power and that he should surrender. He did surrender by walking out of his apartment under his own power with his hands in the air. The officer who took the defendant's statement at police headquarters immediately after the defendant was arrested testified that the defendant had no difficulty recounting the recent events. The statement was entered into evidence and shows considerable detail. Here, as in State v. Reagin, 64 Mont. 481, 210 P. 86, where the jury has been properly instructed and there is sufficient credible evidence to support its finding, the question of the relationship of voluntary intoxication to specific intent will not be reconsidered upon appeal.

In passing it may be worthwhile to observe that State v. Quinlan, 126 Mont. 52, 244 P.2d 1058, cited by the defendant in support of his contention that he was so intoxicated as to be unable to form the specific intent necessary to the crime of first degree assault is not persuasive. In the first place, State v. Quinlan, supra, probably states a rule of criminal responsibility which is on the very fringe of the operation of statute and may be reviewed in a proper case. In the second place, the Quinlan case is not in point here because it is based on section 94-201, subd. (5) while this appeal is concerned with section 94-119, subd. (1).

The defendant's contentions that there was a conspiracy to violate his civil rights and that he was subjected to an illegal search and seizure are without merit. A discussion of these contentions would not serve to add any substance to what has already been said herein.

Finding no reversible error the conviction is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES ADAIR, CASTLES and JOHN CONWAY HARRISON, concur.