STATE of South Dakota, Plaintiff
and Appellee,

v.

Dean FREY, Defendant and Appellant.

16034.

Supreme Court of South Dakota.

Considered on Briefs Oct. 13, 1988.
Reassigned Jan. 3, 1989.
Decided May 3, 1989.
Rehearing Denied June 9, 1989.

Rita D. Haverly of Hagen & Wilka, P.C., Sioux Falls, for defendant and appellant.

Wade A. Hubbard, Asst. Atty. Gen. and Roger A. Tellinghuisen, Atty. Gen., on brief, Pierre, for plaintiff and appellee.

MILLER, Justice (on reassignment).

This is a criminal action in which appellant Dean Frey appeals his conviction on two counts of aggravated assault. In affirming the conviction, we hold (1) that appellant was not entitled to a jury instruction on the lesser offense of simple assault; (2) that appellant's issue regarding the variance between the charging language of the indictment and the jury instruction was not properly preserved for appeal; (3) that the trial court did not err in not submitting a trespass (by law enforcement officers) issue to the jury; and (4) that appellant was not entitled to have a jury instruction on his theories of self-defense and defense of others.[1]

### THE PLAYERS

To follow the factual scenario, it is necessary to identify the "players" in this litigation.

Michael Schmeltzer (Schmeltzer) is a wildlife conservation officer (game warden) for the South Dakota Department of Game, Fish & Parks stationed in Lemmon, Perkins County, South Dakota. He has been a game warden since 1981 and is a certified law enforcement officer.

Nick Schaefer (Schaefer) is Chief of Police of Lemmon and a deputy sheriff for Perkins County. He has been a law enforcement officer for approximately fourteen years.

Roland Frey (Roland) is a rancher who resides on a ranch with his parents in northwestern South Dakota, three miles south of the North Dakota community of White Butte. The ranch has two sets of buildings, one occupied by his parents and another by Roland and occasionally by his brother, appellant Dean Frey.

Dean Frey (Dean or appellant) ranches with his parents and Roland. He has a home in White Butte, North Dakota, and periodically resides with Roland on the ranch three miles south of that community.

Willy and Nilly are Freys' two tame goats who were slaughtered for meat and whose carcasses were left to hang from the front of a farmhand loader in preparation for butchering.

### THE SCENE

In the early evening of September 28, 1986, Roland and Dean slaughtered and hung the carcasses of Willy and Nilly from Frey's farmhand loader. Roland drove to his parents' home for supper. Dean remained in Roland's home to read and relax.

An anonymous citizen driving by Roland's place observed from the road the carcasses of Willy and Nilly which were hanging from the farmhand.[2] Thinking they were possibly deer, the citizen made a TIPS call to Schmeltzer.[3]

Because there was no open season at that time for game animals in South Dakota (however, the North Dakota archery deer season was open), Schmeltzer decided to investigate. Because dusk was approaching, Schmeltzer (pursuant to a recommended department policy) contacted

---

1. Appellant's counsel on appeal was not his trial counsel.

2. See pictures appended to this opinion.

3. Under the TIPS (Turn In Poachers) program, callers may anonymously contact a game warden or the South Dakota Department of Game, Fish & Parks if they suspect that a game animal has been taken out of season.

Deputy Schaefer to accompany and assist him in the investigation.

Schmeltzer and Schaefer, who were both in uniform, drove in Schmeltzer's official, marked vehicle to Roland's ranch. From the road they observed Willy and Nilly hanging from the farmhand on a hill approximately two to three hundred yards from the buildings. However, because dusk was approaching, they were unable to identify the species of the animals even with the aid of a 20 power spotting scope.

While making their observations, they saw a vehicle approaching the ranch and recognized it as Roland's (both officers were acquainted with Roland and Dean). The vehicle pulled into the ranch driveway and they followed.

## THE ALTERCATION

The officers followed Roland into the yard and parked behind his vehicle. Roland immediately approached Schmeltzer's pickup, and in a manner most untypical of western South Dakota hospitality, greeted them by stating to Schmeltzer: "What the f___ are you doing on my property? Who's that a__h___ you have in there with you?" [4] As Schmeltzer began exiting the vehicle, Roland stated: "What are you doing on my property? You need a warrant to come on my property you a__h___. Where is your f___ing warrant? What are you doing here? ... I know who the f___ you are. What I want to know is what you're doing on my Goddamn property?" Schmeltzer explained that he had received a TIPS call concerning two deer hanging on the farmhand loader and that he had simply driven out to check on the complaint. Because of Roland's obvious anger, Schmeltzer asked Roland to take his hands out of his pockets in case Roland had a weapon. About that time, another car appeared in the driveway and, as Schmeltzer was about to check to see who was in the car, Roland grabbed Schmeltzer by the arm with both hands and said "You're not going anywhere you son of a bitch." At this time, Schmeltzer

"pinched" his holster with his other hand, pulled his wrist away to break Roland's grip and told Roland to never grab him like that.

Roland then advised him that "I didn't kill any f___ing deer. Those are goats. They're two tame f___ing goats. You come up there with me and I'll show you those are tame goats."

Schmeltzer testified that Roland insisted that Schmeltzer accompany him to the farmhand to observe the goats. Roland testified that Schmeltzer insisted on going up to see them and that Schmeltzer pushed Roland when Roland tried to stop him. (It should be noted that Schaefer, according to Roland, stayed at the pickup, on Roland's direct instructions.) Regardless, once at the farmhand, it became obvious that the carcasses were domestic goats.

About this same time, Dean, who had heard the commotion fron inside Roland's trailer, grabbed a shotgun and five shotgun shells and went to investigate. Although there was a dispute in the testimony as to what happened at this time, it is clear that almost immediately after arriving at the scene of the dispute, Dean knew specifically who Schmeltzer and Schaefer were and that they were there on official business.

There is a significant discrepancy between the parties regarding Dean's specific conduct when he arrived on the scene:

(1) Schmeltzer's testimony:

Immediately after the goats were identified he heard a shot from the darkness. He heard Dean shout "What the f___ is going on? What are you f___ers doing?" At this point Schmeltzer noticed Dean approaching out of the shadows with a shotgun in his hand. Dean then shouted "What the f___ are you c___s___ers doing trespassing on my private property? I have every right to kill you. I have every right to blow your ass away for trespass. I think I'll do it." Dean then knelt down approximately seven feet from him and pointed the shotgun at his

---

4. The exact expletives have been edited, but their message is still clear.

Roland denies a significant use of profane language, although he admits he was angry and loud.

face, stating, "Don't you move. I've got every right to kill you. I think I will blow your asses away." When Schmeltzer tried to explain to Dean why he was there, Dean yelled "You better get the f___ off of my property before I kill you" and then immediately thereafter warned "Don't you move." Dean then inquired of Schmeltzer who the other man was that was with him, and when Schmeltzer advised him, Dean yelled for Schaefer to "Get your ass up here." When Schaefer replied that he would prefer to stay where he was, Dean swung the shotgun towards the direction from which Schaefer had spoken and fired it and then immediately spun back and again pointed the gun at Schmeltzer. After various other threatening statements, Schmeltzer advised them that he should leave and an argument ensued as to whether Schmeltzer had been involved in reporting that Freys were growing marijuana in their cornfield. Things "cooled" a little bit and Schmeltzer turned around and walked down the hill to his pickup. He never looked back, but did hear another shot fired and heard Dean shouting "You better get out of here before I change my mind and come out there and kill both of you." Dean then made another threatening statement and fired another round. After Schmeltzer entered his vehicle and was driving out of the driveway, another shotgun blast was fired.

(2) Schaefer's testimony:

Schaefer generally corroborated Schmeltzer's statement. He specifically heard Dean say "I should blow your f___ing head off for trespassing" and saw Dean get down on his knee and point the shotgun toward Schmeltzer's head. He heard a shotgun blast as he was approaching the pickup to radio for assistance and was fearful that Schmeltzer had been killed.

(3) Roland's testimony:

Roland testified that Schmeltzer told him that he was going to look at the carcasses whether he liked it or not, and that despite his protestations regarding the search of his premises, Schmeltzer proceeded up the hill, but Schaefer stayed at the pickup on Roland's directions. Schmeltzer pushed Roland as they were approaching the carcasses and Roland then heard his brother Dean approaching and inquiring "What the hell is going on up here." When Schmeltzer observed that Dean had a shotgun, Schmeltzer "pulled his hand back to his left side and touched his holster." Dean told him to "watch his hand." Upon learning why Schmeltzer was there Dean inquired as to why Schaefer was there. Dean never shouldered his gun nor pointed it at Schmeltzer but he did fire his gun into the air because Schmeltzer "was dragging his feet" about getting off their property. As the officers were leaving the premises, Roland took the gun from Dean and fired three shots into the air, but was not aiming at the vehicle.

(4) Dean's testimony:

Dean testified that after hearing the commotion he looked out the window and saw Roland walking backwards uphill towards the goats and that Schmeltzer was pushing him. Dean grabbed the shotgun and shells because he thought someone was beating up his brother. Upon approaching them, Dean recognized Schmeltzer and even saw the badge on his coat. When Schmeltzer saw him approaching with the gun Schmeltzer "jerked his hand down and touched his gun." Dean never pointed the shotgun at Schmeltzer's head, but he did tell Schmeltzer that "you're the red-headed son of a bitch that's telling people we're growing marijuana in our corn field." As they were leaving the goats, he fired the shotgun into the air. Dean was shouting loudly and used profanity, but never aimed or shot the gun at either officer. He did fire another warning shot into the air, and then Roland took the shotgun and fired the last three shots into the air as the officers left the scene.

Dean was charged with two counts of aggravated assault under SDCL 22-18-1.-

1(5).[5] After hearing all of the evidence, the jury found him guilty on both counts. The trial court sentenced him to two concurrent twelve-year terms in the state penitentiary and this appeal followed.

## ISSUES

Although not submitted in this numerical order, the issues submitted by appellant are:

### I

WHETHER FREY WAS ENTITLED TO HAVE THE JURY INSTRUCTED ON THE LESSER INCLUDED OFFENSE OF SIMPLE ASSAULT.

### II

WHETHER THE VARIANCE BE-TWEEN THE OFFENSE DESCRIBED IN THE INDICTMENT AND THE OF-FENSE DESCRIBED IN THE JURY IN-STRUCTIONS CONSTITUTES RE-VERSIBLE ERROR.

### III

WHETHER FREY WAS ENTITLED TO HAVE THE ISSUE OF WHETHER A TRESPASS HAD OCCURRED JUSTI-FYING FREY'S USE OF FORCE SUB-MITTED TO THE JURY.

### IV

WHETHER FREY WAS ENTITLED TO HAVE THE JURY INSTRUCTED ON HIS THEORIES OF SELF–DEFENSE, DEFENSE OF OTHERS AND MIS-TAKE OF FACT.

## DECISION

1. Lesser Included Offense Instruction.

■ The trial court instructed the jury on aggravated assault under SDCL 22–18–1.1(5). Aggravated assault is defined as "[a]ttempts by physical menace *with a*

---

**5.** That statute reads as follows:
Any person who:
. . . .
(5) Attempts by physical menace with a deadly weapon to put another in fear of imminent serious bodily harm;

*deadly weapon* to put another in fear of imminent serious bodily harm[.]" (Emphasis added.) Frey proposed a simple assault instruction as a lesser-included offense under SDCL 22–18–1(4), as "[a]ttempts by physical menace to put another in fear of imminent serious bodily harm, with or without the actual ability[.]" This instruction was denied.

The trial court must instruct the jury on the lesser-included offense if, under both a legal and a factual test, the evidence would support a conviction on the lesser charge.[6] *State v. Heumiller*, 317 N.W.2d 126 (S.D. 1982). The proposed instruction omitted the "with a deadly weapon" language required for aggravated assault. The record indicates that the assault charge arose sole-ly from Frey's use of the shotgun. There is no allegation that he physically assaulted the officers in any other manner. Al-though this evidence could support a con-viction for simple assault, it does not throw doubt on the greater offense. As stated in *State v. Rich*, 417 N.W.2d 868, 871 (S.D. 1988):

> In this case the assault was carried out by means of a pitchfork. That was a dangerous weapon and caused serious bodily injury. Rich does not appear to contend otherwise. Rich intentionally used the pitchfork or he did nothing. . . . Here, Rich was either guilty as charged or not guilty of any offense.

Juries are bound by the evidence and should be limited to those included crimes which a reasonable view of the evidence will sustain and does not convince beyond a reasonable doubt the additional element of the greater crime existed. *Id.* In view of *Rich*, the factual test was not satisfied and the trial court properly denied the lesser-in-cluded instruction.

2. Re: Variance Between Indictment and Instruction.

■ The two-count indictment against Frey charged, in part:

> is guilty of aggravated assault. Aggravated as-sault is a Class 3 felony.

---

**6.** SDCL 23A–26–7 does not apply because as-sault is not a crime divided into degrees. *State v. Rich*, 417 N.W.2d 868 (S.D.1988).

... Dean Frey did commit the public offense of Aggravated Assault (SDCL 22–18–1.1(5)[)] in that Dean Frey did attempt by physical menace with a deadly weapon, to-wit: a shotgun, to put Nick Schaefer, *a Perkins County Deputy Sheriff, engaged in the performance of his duties*, in fear of imminent serious bodily harm[.] (Italics added.)

... Dean Frey did commit the public offense of Aggravated Assault (SDCL 22–18–1.1(5)[)] in that Dean Frey did attempt by physical menace with a deadly weapon, to-wit: a shotgun, to put Michael L. Schmeltzer, *a South Dakota Wildlife Conservation Officer, engaged in the performance of his duties*, in fear of imminent serious bodily harm[.] (Italics added.)

In reciting the elements of SDCL 22–18–1.-1(5) in instruction # 5, the trial court omitted reference to the italicized portions of the indictment. Frey claims that this omission improperly eliminated elements to be proved by the State.

Frey did not object to this variance at trial and failed to preserve the issue for appeal. Further, the indictment sufficiently set out the elements of the crime so as to apprise Frey of the crime charged. *State v. Heisinger*, 252 N.W.2d 899 (S.D.1977). The jury instructions correctly stated the law and it was unnecessary to instruct the jury on the italicized language in the indictment, especially in the absence of an objection. *State v. Huber*, 356 N.W.2d 468 (S.D. 1984). We will not take notice of the claimed error as plain error, as it clearly was not obvious and substantial. *State v. Dornbusch*, 384 N.W.2d 682 (S.D.1986).

3. Refusal of Trespass Instructions.

■ Frey proposed two instructions defining trespass and justification of force to prevent trespass under SDCL 22–18–4.[7]

The trial court in Instruction 6a advised the jury:

Ordinarily, an officer of the law who goes upon private property while investigating a crime is not a trespasser.

The general rule is that: Conduct otherwise a trespass is often justifiable by reason of authority vested in the person who does the act, as, for example, an officer of the law acting in the performance of his duty.

• The trial court's instruction is a verbatim quote of the settled law of this state as set forth in the case of *State v. Cook*, 319 N.W.2d 809, 812 (S.D.1982). In *Cook*, we cited and relied upon *United States v. Barnett*, 492 F.2d 790 (5th Cir.1974); *United States v. Knight*, 451 F.2d 275 (5th Cir. 1971), *cert. denied* 405 U.S. 965, 92 S.Ct. 1171, 31 L.Ed.2d 240 (1972); *State v. Van Rees*, 246 N.W.2d 339 (Iowa 1976); *State v. Lukus*, 149 Mont. 45, 423 P.2d 49 (1967); 75 Am.Jur.2d *Trespass* § 43 (1974).

■ We appreciate that this rule is not without limitation. As stated by the *Van Rees* court: "What we have said does not, of course, permit an officer to enter one's home or to conduct a search or make a seizure without a warrant or other authority." 246 N.W.2d at 343. We must observe however that the officers here did not conduct a warrantless search because Frey chose to display the carcasses in a conspicuous manner, thus eliminating any expectation of privacy.[8] *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The constitutional protection against unlawful searches and seizures is accorded to "persons, houses, papers, and effects," but *does not extend to open fields*. *Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898, 900 (1924). An open field may include any unoccupied or undeveloped area outside of the curtilage of a home, and need be nei-

---

7. SDCL 22–18–4 provides:
   To use or attempt or offer to use force or violence upon or toward the person of another is not unlawful when committed either by the party about to be injured, or by any other person in his aid or defense, in preventing or attempting to prevent an offense against his person or any trespass or other unlawful interfer-

ence with real or personal property in his lawful possession; provided the force or violence used is not more than sufficient to prevent such offense.

8. There is no dispute that the officers were acting in the performance of their duty.

ther "open" nor a "field" as those terms are used in common speech. *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984):

In *Oliver*, the United States Supreme Court also noted that the central component in determining whether a search is within the protected curtilage of the home is whether the area harbors the "intimate activity associated with the internal 'sanctity of a man's home and the privacies of life.'" 466 U.S. at 180, 104 S.Ct. at 1742, 80 L.Ed.2d at 225 *quoting Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886). The analysis of the curtilage was furthered in *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), wherein the Court held that the curtilage of a home could be determined with reference to four factors: (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) *the steps taken by a resident to protect the area from observation by people passing by.* *See also California v. Ciraolo*, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (Powell, J., dissenting).

Here, the goat carcasses were hung from the raised scoop of a farmhand in an open farmyard and were clearly visible from either of the two county roads which are appurtenant to Frey's property. Only the officers' distance from the animals and the increasing darkness of the evening prevented them from positively identifying the species of the animals. It is clear that an analyses and application of *Dunn, Ciraolo, Oliver* and our own case of *State v. Vogel*, 428 N.W.2d 272 (S.D.1988), leads to the conclusion that Frey had absolutely no expectation of privacy in the animals. The officers' entry onto the property for the purposes of identifying the animals' species thus was perfectly legal.

Further, the jury, by their verdict, obviously concluded that Roland Frey consented to show Schmeltzer the animals hanging from the farmhand, negating any assertion that the search was involuntary. This question of fact and witness credibility is clearly within the purview of the jury, and we may not disturb it on appeal where the evidence is sufficient to support their verdict. *State v. LaCroix*, 423 N.W.2d 169 (S.D.1988).

4. Re: Self–Defense, Defense of Others, and Mistake of Fact Instructions.

The trial court also denied Frey's proposed instructions on self-defense, defense of others, and mistake of fact. "[A] defendant in a criminal case is entitled to an instruction on his theory of the case if there is evidence to support it and a proper request is made." *United States ex. rel Means v. Solem*, 646 F.2d 322, 328 (8th Cir.1980). "If instructions on self-defense or defense of others are supported by the evidence, they are necessary and it is error not to give them." *Huber*, 356 N.W.2d at 474. Self-defense and defense of others were central theories relied upon by Frey and he made a proper request for the instructions. The question remaining is whether there is evidence to support these instructions.

■ The evidence certainly does not support giving of the self-defense instruction. Dean Frey himself testified that he had no reason to believe that he was in danger; rather he was concerned for his brother Roland. The evidence thus does not warrant the giving of a self-defense instruction because Frey is not entitled to any better version of the facts than he himself testifies to. *See, e.g., Swier v. Norwest Bank*, 409 N.W.2d 121 (S.D.1987) (Henderson, J., dissenting); *Connelly v. Sherwood*, 268 N.W.2d 140 (S.D.1978); *accord Swee v. Myrl & Roy's Paving, Inc.* 283 N.W.2d 570 (S.D.1979); *Drier v. Perfection, Inc.*, 259 N.W.2d 496 (S.D.1977).

Additionally, there is *no testimony* that Frey was verbally or physically threatened by either of the officers. Frey points to Schmeltzer's "reaching for his gun," but this was done only after he saw Frey approaching him with a shotgun. We have stated that "conditions brought about by one's own conduct may not be relied upon to invoke the excuse of self-defense." *Rich*, 417 N.W.2d at 872 *citing State v.*

*Means,* 276 N.W.2d 699, 701 (S.D.1979). There was insufficient evidence to support an instruction on self-defense. *State v. Chamley,* 310 N.W.2d 153 (S.D.1981).

■ The testimony does not support Frey's proposed instruction on mistake of fact. He testified that he was able to identify Schmeltzer and Schaefer as law enforcement officers. Even assuming he did not recognize them when he first arrived at the scene, he continued to threaten them and did not voluntarily put down the gun once he ascertained their identity. In fact, the shots were fired *after* the identification was made. It is bizarre to suggest that there is a mistake of fact question left for the jury.

■ Similarly, the facts do not support giving the defense of others instruction. Frey relies upon SDCL 22–18–4,[9] but the facts do not support application of that statute. The evidence does not support any argument that he or Roland were "about to be injured." Further, as stated above, as a matter of law there was no "trespass or other unlawful interference with real or personal property" to be defended against. Additionally, Frey's conduct, under the circumstances here, certainly was "more than sufficient" to prevent any claimed offense against either one of them. He knew that Schmeltzer and Schaefer were law enforcement officers and that their intentions were not hostile. Yet, he continued to threaten them with a firearm and even fired the gun. *See, e.g., United States v. Heliczer,* 373 F.2d 241 (2d Cir.1967), *cert. denied* 388 U.S. 917, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967); *State v. Feyereisen,* 343 N.W.2d 384 (S.D.1984).

Affirmed.

WUEST, C.J., and MORGAN, J., concur.

**9.** See footnote 7, *supra.*

\* SDCL 22–18–4 provides:

    To use or attempt or offer to use force or violence upon or toward the person of another is not unlawful when committed either by the party about to be injured, or by any other person in his aid or defense, in preventing or

SABERS, J., concurs in part and dissents in part.

HENDERSON, J., dissents.

SABERS, Justice (concurring in part and dissenting in part).

The trial court erred in refusing to instruct the jury on trespass, justification of force to prevent trespass, defense of others, and mistake of fact. The majority affirms that error.

*1. Trespass Instructions.*

Frey proposed Instructions # 2 and # 3. These instructions defined trespass and justification of force to prevent trespass under SDCL 22–18–4.\* The trial court refused these instructions. Instead, the court instructed the jury, over Frey's objection, that an officer acting within his authority is ordinarily not trespassing when investigating a crime upon private property.

To support the trial court's instruction, the State cites the general rule in *State v. Cook,* 319 N.W.2d 809 (S.D.1982):

    Conduct otherwise a trespass is often justifiable by reason of authority vested in the person who does the act, as, for example, an officer of the law acting in the performance of his duty.

*Id.* at 812 (*citing* 75 Am.Jur.2d *Trespass* § 43 (1974)). Courts have recognized the rule that "Ordinarily, an officer of the law who goes upon private property while investigating a crime is not a trespasser." *Id.* at 812. *See United States v. Barnett,* 492 F.2d 790 (5th Cir.1974); *State v. Van Rees,* 246 N.W.2d 339 (Iowa 1976); *State v. Lukus,* 149 Mont. 45, 423 P.2d 49 (1967). However, this rule is not without limitation. The *Van Rees* court stated:

    We hold [the officer] was entitled to enter defendant's premises to carry out this duty. For this limited purpose he was attempting to prevent an offense against his person or any trespass or other unlawful interference with real or personal property in his lawful possession; provided the force or violence used is not more than sufficient to prevent such offense.

not a trespasser and did not require defendant's consent.

What we have said does not, of course, permit an officer to enter one's home or to conduct a search or make a seizure without a warrant or other authority. *Id.* at 343.

The undisputed evidence showed the officers did not possess a search warrant, and that Roland requested the officers to leave the property. Although there is some testimony that the Freys consented to the search, there is also evidence indicating that the Freys did not consent to the officers' presence and search on the property. Under these circumstances, the court could not properly conclude, as a matter of law, that the Freys consented to the search.

The plain view exception is inapplicable under these facts. Plain view requires that the evidence is discovered inadvertently, in other words that the officer did not know in advance the location of the evidence. *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). This discovery was not inadvertent, as the officers went to the Frey ranch for the sole purpose of searching for the animals mentioned by the anonymous tip. Unable to determine the species of the animals from the highway, the officers waited and followed Roland up the driveway before proceeding onto the property. This indicates knowledge on the part of the officers that an unwarranted search was illegal and evidences a lack of good faith, another requirement of plain view. *Brown, supra.*

Finally, the State has not shown other exigent circumstances justifying the warrantless search by the officers. *State v. Bennett*, 295 N.W.2d 5 (S.D.1980); *State v. Max*, 263 N.W.2d 685 (S.D.1978). The trial court held that a search warrant was unnecessary under SDCL ch. 41–15, which relates to enforcement powers and procedures for the Department of Game, Fish, and Parks. Although these provisions purport to grant broad powers for warrantless administrative searches, these provisions cannot exceed the protections afforded by the constitution. *State v. Stip*, 246 N.W.2d 897 (S.D.1976).

South Dakota has created a statutory privilege to use reasonable force to protect persons or property under SDCL 22–18–4. The trial court should have instructed the jury on this potential justification to aggravated assault, as the facts raised a jury question regarding consent to the trespass and the reasonableness of the force used under the circumstances. The trial court erred in concluding, as a matter of law, that the warrantless search was justified under these provisions and that the officers were acting within their lawful and official duties.

2. *Defense of others and mistake of fact instructions.*

The trial court denied Frey's proposed instructions on defense of others and mistake of fact. "[A] defendant in a criminal case is entitled to an instruction on his theory of the case if there is evidence to support it and a proper request is made." *United States ex rel. Means v. Solem*, 646 F.2d 322, 328 (8th Cir.1980). "If instructions on self-defense or defense of others are supported by the evidence, they are necessary and it is error not to give them." *State v. Huber*, 356 N.W.2d 468, 474 (S.D. 1984). Defense of his brother and mistake of fact was relied upon by Frey and he made a proper request for the instructions. Although Frey was not entitled to a self-defense instruction because of insufficient evidence, there was sufficient evidence to support defense of others and mistake of fact instructions.

Frey testified that he grabbed his shotgun before leaving the house because he believed his brother was in danger. This testimony is supported as both parties testified that a great deal of arguing, cursing, and shouting took place between Roland and the officers. The record indicates that it was dark which supports Frey's claim that he was unable to identify the other persons as law enforcement officers. This evidence also supports Frey's instruction on mistake of fact. While there was some testimony that Frey went beyond the reasonable force necessary to protect his brother, this determination should have been made by a jury upon proper instruc-

tions and not by the court. The mistake made by the trial court and the majority is in accepting the version of the evidence most favorable to the State, rather than to the defendant. This is error when considering whether there is sufficient evidence to support jury instructions. *State v. Moffett*, 147 Wis.2d 343, 433 N.W.2d 572 (1989); *State v. Clayburn*, 223 Neb. 333, 389 N.W. 2d 314 (1986); *Van Zee v. Assam*, 336 N.W.2d 162 (S.D.1983); *State v. Oien*, 302 N.W.2d 807 (S.D.1981).

The State claims that any alleged error in refusing Frey's proposed instructions was not reversible as prejudicial error. *State v. Stapleton*, 387 N.W.2d 28 (S.D. 1986); *State v. Grey Owl*, 295 N.W.2d 748 (S.D.1980). In *Grey Owl* this court stated:

Hence, the jury should have been properly instructed thereon. The requested jury instruction was vital in properly directing the jury's attention to a matter extremely material to the case. If the requested jury instruction ... had been given, a different light could have been placed on the victim's testimony potentially strengthening the chances for appellant's acquittal.

*Id.* at 751. The instructions on defense of others, mistake of fact, and trespass were vital in directing the jury's attention to possible justifications for Frey's actions. These instructions were necessary to enable the jury to consider all the evidence in a proper light. It was reversible error not to instruct on these possible justifications.

The majority presents an elaborate and detailed factual presentation of this case. In doing so, the majority fails to appreciate that this is exactly why the instructions on trespass, defense of others, and mistake of fact were necessary. As Marshall McLuhan states "the medium is the message." The message sent by the majority is that this is a factual case and these questions should have been given to the proper fact finder, the jury, and not the court. I would reverse and remand for a fair trial on proper instructions in accordance with this writing.

HENDERSON, Justice (dissenting).

Without a search warrant, at night, two law enforcement officers entered upon a ranch in Western South Dakota, engaged in quarrelsome and rough language with two ranchers, pushed and shoved these two ranchers, and marched—as they did so, to two butchered, domesticated goats, hanging on a tractor and grapple fork. These two animals were raised for eating and were placed there to cool and cure. These law enforcement officers were 100% trespassers and interlopers. In my opinion, the constitutional rights of these ranchers were violated. Lest any reader believe that this case is not of deep constitutional import, there are thousands of ranches in Western South Dakota (not to mention Central and Eastern South Dakota) where men and women of independent ilk have long believed that their property is sacred. This case goes to the heart of every rural family's constitutional rights. This rancher, for insisting upon a search warrant, and for ordering these officers off of this ranch, ultimately received two concurrent twelve-year terms in the South Dakota State Penitentiary. Under the instructions given to the jury by the trial judge, this rancher was stripped of his legitimate defenses. Therefore, there is reversible error and these two concurrent twelve-year sentences should be reversed and this rancher be granted a fair trial.

The Fourth Amendment to the United States Constitution and Article VI, § 11, of the South Dakota Constitution ensure the right of every citizen of this state to be secure against unreasonable searches and seizures. In the facts before us, we had an unreasonable search. It was prompted by an informant who thought he spotted illegal deer hanging from the tractor and grapple fork. Even using binoculars, these two officers could not tell if the these animals were goats or deer. So they proceeded, by force, and by *armed force*, to search the premises to determine if the hanging animals were deer. Obviously, the ranchers were outraged, believing that they lived in a free land and were guaranteed rights under the United States Constitution. It was a reversible error for the trial court to

make this determination: "Under the circumstances presented in this case, I am ruling, by giving 6A, that the defendant or the officers were not trespassing." Defense counsel, acting for these ranchers, tendered instruction A defining trespass. The trial judge refused to tell the jury about trespass. In my opinion, it was, at the very least, a question of fact as to whether or not the officers were trespassing. It is a jury question. *State v. Brown,* 93 N.M. 236, 238, 599 P.2d 389, 391 (1979). A search of private property, except in certain carefully defined classes of cases, is unreasonable absent authorization by a valid search warrant. *State v. Jorgenson,* 333 N.W.2d 725, 726 (S.D.1983).

Having been unable to determine whether the hanging animals were deer or goats, the law enforcement officers could have applied for a search warrant on the following morning. These officers refused to wait until the following morning. Instead, they made a warrantless search. There were no exigencies which compelled their trespassing and forcing themselves upon this property. These officers, in the State of South Dakota, have made no showing that they are exempt from a warrant requirement. In *State v. Max,* 263 N.W.2d 685 (S.D.1978), this Court set down seven considerations which are relevant in determining if there is justification for a warrantless intrusion for search or arrest. They are:

1. That a grave offense is involved, particularly a crime of violence;
2. that the suspect is reasonably believed to be armed;
3. that a clear showing of probable cause exists, including "reasonably trustworthy information," to believe that the suspect committed the crime involved;
4. that there is a strong reason to believe that the suspect is in the premises being entered;
5. that a likelihood exists that the suspect will escape if not swiftly apprehended;
6. that the entry, though not consented to, is made peaceably; and
7. time of the entry.

*Max,* 263 N.W.2d at 687. There was no showing or even any type of a belief on the part of the officers that a grave offense was involved, much less a crime of violence. The "grave offense" suspected here was taking deer by unlawful means, or, according to Officer Schmeltzer, failing to properly tag the carcasses. I note that these events occurred during bow-hunting season. There was no probable cause to believe that any crime had, in fact, happened. Lacking probable cause to believe a crime had been committed, the potential armament or escape of any suspect is irrelevant. The entry was unlikely to be peaceable, under the circumstances, and took place at night. On these facts, no exigent circumstances existed to justify the search, and it is patent that these officers acted unlawfully. As their actions were unlawful, the officers cannot shield behind their status as law enforcement agents. Trespass laws may contain an exception for such agents acting in performance of their duty, *State v. Cook,* 319 N.W.2d 809 (S.D. 1982), but the officers here were beyond the bounds of legitimate demands of their duty. This was not legal pursuit of duty. Rather, it was an arrogant abuse of authority. In the context of investigation of two deer/goats, these officials lost all sense of proportion, and the defendant is now to pay the price for their bad judgment. The conduct of these officers violated the settled law of this state. The so-called "tip" was of such a shaky nature that neither the informant nor the law enforcement officers had a reasonable belief that a crime had been committed.

Now, it is desirable to add more factual background for a reader's better understanding of this case. It may be called disputed evidence, but it was, nevertheless, evidence which this judge and jury heard. As the march by the law enforcement officers up the hill to "Willy" and "Nilly" continued, these animals having pet names, and as the rancher continued to protest the officers' presence, the defendant/brother, who had heard angry shouting going on, was running up the hill—carrying his shotgun, asking what was going on. Officer

Schmeltzer reached for his revolver, which was the second time he had done so, and told the defendant/brother/rancher to "watch your hand." The reason that I mention this fact is that prior to the march up the hill, Officer Schmeltzer had placed a hand on his gun, in a threatening manner, while on the rancher's property, because Roland Frey (not the defendant) had put *both* hands in his pockets. It suggests to any fair-minded person the outlandish and outrageous conduct of this officer while trespassing upon the rancher's land. Fact or disputed fact, but nevertheless the testimony: The defendant/brother saw Officer Schmeltzer push and shove his brother up the hill where "Willy" and "Nilly" were. Everything that is decent and good about this great Nation came crashing down in Perkins County that very late afternoon and evening. Law enforcement zeal beyond the wildest imagination took place, and a man who stood up for his rights, under our federal and state constitutions, ended up with two twelve-year sentences to the State Penitentiary. For what action? Answer: For insisting upon his constitutional rights and for having raised two domesticated goats to eat. Can we realistically claim that this Nation is still "free" when such type of conduct as this takes place, under the disputed evidence, and some of which is not disputed, and then the landowner becomes stripped of his defenses by the trial court's legal instructions to the jury?

Recently, in *State v. Vogel,* 428 N.W.2d 272 (S.D.1988), this Court had the occasion to distinguish between the extent of legal protection against trespassing and constitutional protection against unreasonable search and seizure. In *Vogel,* we upheld police observations under "open fields" doctrine despite claims of trespass because "the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment." *Vogel, id.* at 276 (quoting *Oliver v. United States,* 466 U.S. 170, 183–84, 104 S.Ct. 1735, 1744, 80 L.Ed.2d 214, 227–28 (1984)). *Vogel* and the United States Supreme Court cases relied upon by the majority are totally distinguishable from the present case for one glaring reason: The officers, here, were ordered off the property. The essential analysis which mandates reversal here is provided in *United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 1139, 94 L.Ed. 2d 326, 335 (1987), in a passage cited in *Vogel, id.* at 276 n. 2, and, ironically, in Justice Miller's current writing, at page 722. The *Dunn* Court observed that the extent of curtilage, and Fourth Amendment protection, is to be resolved "with particular reference to four factors," the fourth of which is "the steps taken by the resident to protect the area from observation by people passing by." In *Vogel,* no protective steps were taken. Here, the warrantless officers were ordered off the property *before* they could identify the goats, and before the defendant became involved in the fracas. What more emphatic step can one take to shield an area than to order an interloper away, in a face-to-face confrontation? The *Dunn/Vogel* analysis mandates the following results: 1) The officers *were* trespassing once they advanced in violation of orders to leave, as they no longer had a right to be there, and 2) Fourth Amendment protection, triggered by the order to leave, was overridden. The "open fields" doctrine does not absolve the officers on these facts as the reach of the Fourth Amendment is adjudged according to the four *Dunn/Vogel* factors even where a house is located "on a large parcel of property and has no nearby enclosing fence." *See Dunn,* 480 U.S. at 301 n. 4, 107 S.Ct. at 1139 n. 4, 94 L.Ed.2d at 335 n. 4. Here, unlike the situation in *Vogel,* the officers were confronted directly, and ordered off the land. While law enforcement officers may enter one's land to investigate under the "open fields" doctrine, this ability exists "absent express orders from the person in possession against a possible trespass." *State v. Harris,* 671 P.2d 175, 178 (Utah 1983) (quoting *United States v. Hersh,* 464 F.2d 228, 230 (9th Cir.1972). "What a person seeks to keep private, even in an area accessible to the public, may be constitutionally protected." *Harris,* 671 P.2d at 178. It is difficult to imagine a more positive indication of a desire for pri-

vacy than a rancher's direct face-to-face order for interlopers to leave his property. For this reason, I cannot accept that the majority's ritual incantation of "open fields" exorcises Fourth Amendment analysis in this case. A search did take place, without a warrant. As the officers had no legitimate justification for staying after being ordered to leave, they were not entitled to the exception to the trespass law which applies to officials in performance of their official duties. Therefore, this defendant was entitled to a jury instruction regarding trespass. There was sufficient evidence, even from the testimony of officers themselves, let alone that of the defendant and his brother, to justify such an instruction.

Similarly, the testimony in this record justified a "defense of others" instruction to the jury. The defendant, according to he and his brother, observed a loud dispute, accompanied by physical violence. The question of whether he undertook his actions in defense of his brother, as allowed by SDCL 22–18–4, was a matter for the jury to decide.

This is not a springboard for my personal sense of right or wrong. United States Supreme Court decisions and South Dakota Supreme Court decisions sustain my conviction. It is simply my intent to protect the constitutional rights of farmers and ranchers of this state from unlawful invasions by law enforcement on their property. Unfortunately for the entrepreneurial ranchers and farmers of South Dakota, this decision provides a fertile field for further encroachment on their dwindling rights and adds impetus to the exodus of families from rural life.